450 F.2d 125
 UNITED STATES of America, Appellant,
v.
22.95 ACRES OF LAND, MORE OR LESS, Situate IN WHITMAN
COUNTY, STATE OF WASHINGTON, Almota Farmers
Elevator and Warehouse Company, a
Washington Corporation, Appellees.
 No. 24757.
 United States Court of Appeals,
Ninth Circuit.
 Sept. 23, 1971.
Rehearing Denied Dec. 9, 1971.
 
 Jacques B. Gelin (argued), S. Billingsley Hill, Dept. of Justice, Shiro Kashiwa, Asst. Atty. Gen., Washington, D. C., Dean C. Smith, U. S. Atty., Robert M. Sweeney, Asst. U. S. Atty., Spokane, Wash., for appellant.
 Lawrence Hickman (argued), of Hickman & Faris, Colfax, Wash., for appellees.
 Before MADDEN, Judge, United States Court of Claims,* and KOELSCH and CHOY, Circuit Judges.
 
 
 1
 J. WARREN MADDEN, Judge, Court of Claims.
 
 
 2
 This is an appeal from a judgment rendered in the United States District Court in a condemnation action. This court's jurisdiction of the appeal rests on Title 28 U.S.Code, Sec. 1291. The District Court rendered judgment for Almota Farmers Elevator and Warehouse Company, "Almota", in the amount of $274,625.00. The United States, the condemnor, appeals, urging that the judgment should have been in the amount of $130,000.00. These divergent figures were contained in a stipulation entered into by the parties in the District Court proceeding, in which the parties agreed that if Almota's theory of the nature of its compensable interest in the property taken should be adopted by the Court, the just compensation for that interest would be $274,625.00, but if the Government's theory should be adopted, the just compensation would be only $130,000.00
 
 
 3
 The condemnation action here under review was brought by the United States on behalf of its Department of the Army, to obtain all right, title and interest of Almota in certain land, which the Government took for the Little Goose Lock and Dam, a river improvement and navigational project on the Snake River below Lewiston, Idaho. The parcel of land in question consists of 0.75 of an acre, located in Whitman County, Washington. The fee title to the land was in the Oregon-Washington Railroad and Navigation Company (Railroad). The condemnee, Almota had a lease from the Railroad on the 0.75 acre tract and had built a 522,500 bushel grain elevator and a "flat house" also used for grain and other storage purposes, on the tract. On the date of the taking, May 26, 1967, a 20 year written lease was in force between the Railroad, as lessor, and Almota, as lessee. The expiration date of the lease was October 12, 1974, which meant that the lease had seven plus a fraction more years to run when the taking occurred on May 26, 1967. The lease contained no option giving the lessee a right of renewal of the lease.
 
 
 4
 Prior to the commencement of the condemnation action here under review, the United States had settled with the fee owner, the Railroad, for the Railroad's interest in the land here in question. We are not advised as to the terms of that settlement. Neither party to this case urges that those terms would be relevant in this case.
 
 
 5
 In the District Court the Government urged that Almota was entitled only to the fair market value of the use of the land and buildings for the seven year plus remainder of the term of its lease, less the agreed annual rent, plus the value of the buildings for removal or salvage purposes. The amount of the judgment, on this basis, was stipulated, as we have seen, to be $130,000.00. Almota, in the District Court, urged that it was entitled to receive as just compensation the full fair market value of the use of the land and of the buildings in place as they stood at the time of the taking on May 26, 1967, without limitation of such use to the remainder of the term of the existing lease. As stated above, the parties stipulated that if Almota's contention should be adopted, Almota's judgment should be in the amount of $274,625.00. The District Court adopted Almota's argument and rendered judgment for it in the amount of $274,625.00. The United States then brought the instant appeal.
 
 
 6
 The Government's computation, limiting Almota's right of recovery to its legally protected interest for the remainder of the term of its written lease, differs so greatly from Almota's computation based upon fair market value, i. e. what a willing buyer would pay to a willing seller, because, in transactions in the market place, traders give weight to facts and circumstances in addition to those recognized and enforced by law. If, for example, a person, A, at about a year previous to the date of taking in this case, had funds available and a desire to acquire a going business, he might have heard of Almota's grain elevator business. Investigation might have disclosed that it was a very profitable enterprise; that there was a large grain growing area which had become accustomed, over the years, to using Almota's elevator for storage and shipment; that the Railroad, the fee owner of the tract on which Almota's buildings were located was glad to have them there because most of the grain stored in the elevator would ultimately be shipped via the Railroad; that the Railroad, because of these circumstances, charged Almota only a nominal rent of $114.00 per year; that Almota had had, ever since 1919, an uninterrupted succession of leases on the land on which Almota's buildings stood.
 
 
 7
 A could well have concluded that if he bought Almota's current lease and buildings, so that he would be in possession of the land as the expiration of Almota's 20 year lease approached, and if he, A, was then operating the elevator business satisfactorily, the Railroad would, as it had always done for Almota, grant A a renewal of his lease, and would do the same in similar occasions in the future. Thus it might have seemed to A that the Almota elevator business was as permanent as the Railroad's business. If a title lawyer warned A that all that A could, with legal certainty, acquire from Almota was the right to occupy the land and use the buildings for the then remaining eight years plus, of the term of the lease, A might well have said that he realized that, but was sure that Almota, in the circumstances, would not sell its lease at a price determined by the lawyer's standard, which price he had computed to be $130,000.00; that if he did not offer more than that he would lose the opportunity to acquire this promising business; and that, all things considered, he had decided to offer Almota $274,625.00 for its interest in the property.
 
 
 8
 If what we have surmised above had occurred, and A had acquired Almota's interest in the land, and a year later the Government had "taken" that interest from A, A's hope and expectation of carrying on, far into the future, the profitable grain elevator business, would have been completely frustrated. It would be said that he had speculated, and lost, unless he could compel the Government to reimburse him for his loss.
 
 
 9
 The question which we must answer in the instant case is "Does the word 'property' in the language of the Fifth Amendment of the Constitution of the United States, '* * * nor shall private property be taken for public use, without just compensation,' include hopes and expectations, even those so well grounded that they have a market value?" Lest it be thought that the answer to the question posed above is easy and obvious, we quote the language of the Supreme Court of the United States in Segal v. Rochelle, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966).
 
 
 10
 [i]t is impossible to give any categorical definition to the word "property", nor can we attach to it in certain relations the limitations which would be attached to it in others.
 
 
 11
 In Segal, the court interpreted the word "property" as used in Bankruptcy Act, 11 U.S.Code Sec. 110(a) (5) "most generously," for the purpose of making available for creditors interests of the bankrupt, even if the enjoyment by him of those interests was to be postponed. In Lines v. Frederick, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), the Court held that $137.28 of "vacation pay" which had accrued but had not yet been paid to a workman, at the time he filed his petition in bankruptcy, was not "property", within the meaning of Sec. 70a(5) of the Bankruptcy Act, supra. In so holding, the Supreme Court affirmed this Court's decision in Frederick v. Lines, 9 Cir., 425 F.2d 215. The Supreme Court in Lines, 400 U.S. at p. 19, 91 S.Ct. at p. 113 said:
 
 
 12
 The most important of the considerations limiting the breadth of the definition of "property" lies in the basic purpose of the Bankruptcy Act to give the debtor a "new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt * *."[1]
 
 
 13
 Whether the Supreme Court regards the word "property" as used in the Fifth Amendment as being as flexible as that Court has held it to be in Segal, supra, and Lines, supra, and, if it does regard it as flexible, what pressures of policy are exerting themselves in one direction or the other, are crucial questions in our instant case.
 
 
 14
 We return to the question whether the word "property" in the Fifth Amendment embraces hopes and expectations which have a market value?
 
 
 15
 In United States v. Petty Motor Co., 327 U.S. 372, p. 380, fn. 9, 66 S.Ct. 596, p. 601, 90 L.Ed. 729 (1946), the Court said,
 
 
 16
 The fact that some tenants had occupied their leaseholds by mutual consent for long periods of years does not add to their rights.
 
 
 17
 The Court, in Petty Motor, at p. 376, 66 S.Ct. at p. 599, said that a tenant whose lease contained a "termination by condemnation" clause had no right of recovery when the property was condemned because the "tenant has no right which persists beyond the taking and can be entitled to nothing".
 
 
 18
 In Scully v. United States, 409 F.2d 1061 (CA 10, 1969), the evidence showed that Scully had extensive land holdings which holdings were leased on an annual basis to numerous tenants. The tenants had no legal right to renewal, but the custom had been to renew them each year. At the condemnation trial there was testimony that because of this custom of renewal, the Scully leases had a market value greater than the value of the one year term and the improvements owned by the tenants. The District Court awarded compensation based upon the tenants' theory. The Court of Appeals reversed, holding that the custom of renewal could not create legal interests extending beyond the express one year terms granted by the leases. The Court relied upon Petty Motor Co., supra. It also quoted with approval language of Holmes, J. in Emery v. Boston Terminal Co., 178 Mass. 172, 59 N.E. 763 (1901), as follows:
 
 
 19
 Changeable intentions are not an interest in land, and although no doubt such intentions may have added practically to the value of the petitioner's holding, they could not be taken into account * * *. They added nothing to the tenant's legal rights, and legal rights are all that must be paid for. Even if such intentions added to the saleable value of the lease, the addition would represent a speculation on a chance, not a legal right.
 
 
 20
 In Scully, the Supreme Court denied certiorari, Meisinger v. Scully, 396 U.S. 876, 90 S.Ct. 152, 24 L.Ed.2d 134.
 
 Almota, in its brief says:
 
 21
 The gist of the argument in the Government's brief appears to be the following statement appearing on pages 4 and 5.
 
 
 22
 Only vested property rights are compensable. Lessee's mere renewal expectancy, not embodied in a lease, does not rise to the status of a vested property right.
 
 Almota then goes on to say:
 
 23
 However, the Company (Almota) at no time has claimed compensation for any renewal expectancy as such, nor did the Court (the District Court) make any award for it as a property right in itself. Two principal rights of ownership were claimed (1) ownership of a leasehold interest in the land and (2) ownership of building and machinery.
 
 
 24
 As to item (1), there is, of course no controversy. The right to occupy the land and use the structures on it for the seven plus years balance of the lease is not disputed and would be paid for by the $130,000 sum for which the Government contends. So the balance of the $274,625.00 sum for which Almota contends hinges, somehow, upon the fact that there were valuable buildings and machinery upon the land. But, of course, the value to Almota of the right to use the buildings and machinery on the land after the expiration of the current lease would depend upon whether Almota would have a right to use the buildings and machinery upon the land, after the expiration of the lease. As far as we are aware, Almota's legal right in its buildings and machinery, after the expiration of the lease, would have been the right to remove them, or to sell them to the railroad or to a successor lessee at a price dictated completely by the purchaser. The disclaimer by Almota in its brief, and the failure to claim, in its pleadings, any compensation for any disappointed renewal expectancy is a by-passing of a route recognized by Almota to be treacherous and unsafe. It would confront the statement, obviously true, of Holmes, J. in Emery, supra that the "market value" of such an interest would "represent a speculation on a chance, not a legal interest". We find no merit in Almota's argument that, because there were buildings, the issue before us is different from what it would have been if there had been no buildings.
 
 
 25
 An important case in this Circuit is Osborne v. United States, 145 F.2d 892, (CA 9, 1944) wherein are collected numerous cases involving claims arising out of disappointed expectations resulting from the revocation of various government permits which were legally revocable. Recovery was denied in all the cases.
 
 
 26
 If the law were to go into the business of awarding compensation for an expectancy which never materialized, because the sovereign "took" the subject of the expectancy, should, in Scully, supra, e. g., the one year lessees be compensated for the loss of a five year occupancy, a 50 year occupancy, a perpetual occupancy? In our instant case, was the stipulation based upon some actuarial computation such as the prospective life of the buildings and machinery, or the life of the railroad, or upon freeranging guesswork?
 
 
 27
 The District Court in our instant case relied heavily upon the important decision of the Court of Appeals for the Second Circuit, United States v. Certain Property, Borough of Manhattan, 388 F.2d 596 (CA 2, 1968). The opinion in that case does support the contentions of Almota in the instant case. It awards compensation for expectations disappointed by the exercise of the sovereign power of eminent domain, expectations not based upon any legally protected right, but based only, to borrow the language of Holmes J. in Emery, supra, upon "a speculation on a chance". In the Borough of Manhattan case, supra, the Court says "* * * an existing tenant usually has the inside track to a renewal for all kinds of reasons-avoidance of costly alterations, saving of brokerage commissions, perhaps even ordinary decency on the part of landlords, * * *". Almota urges that the alchemy performed by the Court in Borough of Manhattan, the conversion of items, which would have weight in the thinking of a speculator, into Fifth Amendment "property" and thence into dollars, is an introduction of modern realism into the law, to displace dry and tired conceptualism.
 
 
 28
 We are not persuaded by the Borough of Manhattan, supra, opinion. We are not aware of any policy such as those which influenced the Supreme Court in the Segal case, supra, and the Lines case, supra, to give certain interpretations to the word property in the Bankruptcy Act, which has a bearing on the meaning of "property" in the Fifth Amendment. The conventional meaning given to the word in Petty Motor Co., supra, and in the analogous situations cited by our court in Osborne v. United States, supra, constitute a body of precedent and tradition on the subject which we think is right. We conclude that the judgment of the District Court is erroneous. We reverse the judgment and remand the case to the District Court with a direction to enter a judgment in favor of the condemnee, Almota Farmers Elevator and Warehouse Company for $130,000.00, each party to bear its own costs.
 
 
 
 *
 Honorable J. Warren Madden, Judge of the United States Court of Claims, sitting by designation
 
 
 [1]
 In our recent decision in In the Matter of E. V. Moore of California, Inc. Bankrupt, 447 F.2d 1106, 1971, we discussed the Segal case and the Lines case, both supra