# ALMOTA FARMERS ELEVATOR & WAREHOUSE CO. *v.* UNITED STATES

No. 71-951.  Argued October 18, 1972—Decided January 16, 1973

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, MARSHALL, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, in which DOUGLAS, J., joined, *post,* p. 479. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE and BLACKMUN, JJ., joined, *post,* p. 480.

*Lawrence Earl Hickman* argued the cause for petitioner.  With him on the briefs was *Philip H. Faris.*

*Assistant Attorney General Frizzell* argued the cause for the United States.  With him on the brief were *Solicitor General Griswold, Wm. Terry Bray, Edmund B. Clark,* and *Jacques B. Gelin.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Since 1919 the petitioner, Almota Farmers Elevator & Warehouse Co., has conducted grain elevator operations on land adjacent to the tracks of the Oregon-

Washington Railroad & Navigation Co. in the State of Washington. It has occupied the land under a series of successive leases from the railroad. In 1967, the Government instituted this eminent domain proceeding to acquire the petitioner's property interest by condemnation. At that time there were extensive buildings and other improvements that had been erected on the land by the petitioner, and the then-current lease had 7½ years to run.

In the District Court the Government contended that just compensation for the leasehold interest, including the structures, should be "the fair market value of the legal rights possessed by the defendant by virtue of the lease as of the date of taking," and that no consideration should be given to any additional value based on the expectation that the lease might be renewed. The petitioner urged that, rather than this technical "legal rights theory," just compensation should be measured by what a willing buyer would pay in an open market for the petitioner's leasehold.

As a practical matter, the controversy centered upon the valuation to be placed upon the structures and their appurtenances. The parties stipulated that the Government had no need for these improvements and that the petitioner had a right to remove them. But that stipulation afforded the petitioner only what scant salvage value the buildings might bring. The Government offered compensation for the loss of the use and occupancy of the buildings only over the remaining term of the lease. The petitioner contended that this limitation upon compensation for the use of the structures would fail to award what a willing buyer would have paid for the lease with the improvements, since such a buyer would expect to have the lease renewed and to continue to use the improvements in place. The value of the buildings, machinery, and equipment in place would be substantially greater than their salvage value at the end

of the lease term, and a purchaser in an open market would pay for the anticipated use of the buildings and for the savings he would realize from not having to construct new improvements himself. In sum, the dispute concerned whether Almota would have to be satisfied with its right to remove the structures with their consequent salvage value or whether it was entitled to an award reflecting the value of the improvements in place beyond the lease term.

In a pretrial ruling, the District Court accepted the petitioner's theory and held that Almota was to be compensated for the full market value of its leasehold "and building improvements thereon as of the date of taking . . . , the total value of said leasehold and improvements . . . to be what the interests of said company therein could have been then sold for upon the open market considering all elements and possibilities whatsoever found to then affect the market value of those interests including, but not exclusive of, the possibilities of renewal of the lease and of the landlord requiring the removal of the improvements in the event of there being no lease renewal." The court accordingly ruled that the petitioner was entitled to the full fair market value of the use of the land and of the buildings in place as they stood at the time of the taking, without limitation of such use to the remainder of the term of the existing lease.

On appeal, the Court of Appeals for the Ninth Circuit reversed, 450 F. 2d 125; it accepted the Government's theory that a tenant's expectancy in a lease renewal was. not a compensable legal interest and could not be included in the valuation of structures that the tenant had built on the property. It rejected any award for the use of improvements beyond the lease term as "compensation for expectations disappointed by the exercise of the sovereign power of eminent domain, expectations

not based upon any legally protected right, but based only . . . upon 'a speculation on a chance.'" 450 F. 2d, at 129. The court explicitly refused to follow an *en banc* decision of the Court of Appeals for the Second Circuit, relied upon by the District Court, which had held that for condemnation purposes improvements made by a lessee are to be assessed at their value in place over their useful life without regard to the term of the lease. *United States* v. *Certain Property, Borough of Manhattan,* 388 F. 2d 596, 601.

In view of this conflict in the circuits, we granted certiorari, 405 U. S. 1039, to decide an important question of eminent domain law: "Whether, upon condemnation of a leasehold, a lessee with no right of renewal is entitled to receive as compensation the market value of its improvements without regard to the remaining term of its lease, because of the expectancy that the lease would have been renewed." [1] We find that the view of the Court of Appeals for the Second Circuit is in accord with established principles of just-compensation law under the Fifth Amendment, and therefore reverse the judgment before us and reinstate the judgment of the District Court.

The Fifth Amendment provides that private property shall not be taken for public use without "just compensation." "And 'just compensation' means the full monetary equivalent of the property taken. The owner is

---

[1] This was the statement of the question presented by the Government in opposing the grant of the petition for certiorari. As the petitioner phrased the question, the Court was asked to decide: "In awarding just compensation to a tenant in the condemnation of a leasehold interest in real property, including tenant owned building improvements and fixtures situated thereon, *may an element of great inherent value in the improvements be excluded* merely because it does not, by itself, rise to the status of a legal property right." (Emphasis added.)

to be put in the same position monetarily as he would have occupied if his property had not been taken." *United States* v. *Reynolds,* 397 U. S. 14, 16 (footnotes omitted). See also *United States* v. *Miller,* 317 U. S. 369, 373. To determine such monetary equivalence, the Court early established the concept of "market value": the owner is entitled to the fair market value of his property at the time of the taking. *New York* v. *Sage,* 239 U. S. 57, 61. See also *United States* v. *Reynolds, supra,* at 16; *United States* v. *Miller, supra,* at 374. And this value is normally to be ascertained from "what a willing buyer would pay in cash to a willing seller." *Ibid.* See *United States* v. *Virginia Electric & Power Co.,* 365 U. S. 624, 633.

By failing to value the improvements in place over their useful life—taking into account the possibility that the lease might be renewed as well as the possibility that it might not—the Court of Appeals in this case failed to recognize what a willing buyer would have paid for the improvements. If there had been no condemnation, Almota would have continued to use the improvements during a renewed lease term, or if it sold the improvements to the fee owner or to a new lessee at the end of the lease term, it would have been compensated for the buyer's ability to use the improvements in place over their useful life. As Judge Friendly wrote for the Court of Appeals for the Second Circuit:

> "Lessors do desire, after all, to keep their properties leased, and an existing tenant usually has the inside track to a renewal for all kinds of reasons—avoidance of costly alterations, saving of brokerage commissions, perhaps even ordinary decency on the part of landlords. Thus, even when the lease has expired, the condemnation will often force the tenant to remove or abandon the fixtures long before he would otherwise have had to, as well as deprive him

of the opportunity to deal with the landlord or a new tenant—the only two people for whom the fixtures would have a value unaffected by the heavy costs of disassembly and reassembly. The condemnor is not entitled to the benefit of assumptions, contrary to common experience, that the fixtures would be removed at the expiration of the stated term." *United States* v. *Certain Property, Borough of Manhattan,* 388 F. 2d, at 601–602 (footnote omitted).

It seems particularly likely in this case that Almota could have sold the leasehold at a price that would have reflected the continued ability of the buyer to use the improvements over their useful life. Almota had an unbroken succession of leases since 1919, and it was in the interest of the railroad, as fee owner, to continue leasing the property, with its grain elevator facilities, in order to promote grain shipments over its lines. In a free market, Almota would hardly have sold the leasehold to a purchaser who paid only for the use of the facilities over the remainder of the lease term, with Almota retaining the right thereafter to remove the facilities—in effect, the right of salvage. "Because these fixtures diminish in value upon removal, a measure of damages less than their fair market value for use in place would constitute a substantial taking without just compensation. '[I]t is intolerable that the state, after condemning a factory or warehouse, should surrender to the owner a stock of secondhand machinery and in so doing discharge the full measure of its duty.'" *United States* v. *1,132.50 Acres of Land,* 441 F. 2d 356, 358.[2]

---

[2] The compensation to which Almota is entitled is hardly "totally set free from [its] property interest," as the dissent suggests. *Post,* at 484. The improvements are assuredly "private property" that the Government has "taken" and for which it acknowledges it must pay compensation. The only dispute in this case is over how those

476

*United States* v. *Petty Motor Co.,* 327 U. S. 372, upon which the Government primarily relies, does not lead to a contrary result. The Court did indicate that the measure of damages for the condemnation of a leasehold is to be measured in terms of the value of its use and occupancy for the remainder of the lease term, and the Court refused to elevate an expectation of renewal into a compensable legal interest. But the Court was not dealing there with the fair market value of improvements. Unlike *Petty Motor,* there is no question here of creating a legally cognizable value where none existed, or of compensating a mere incorporeal expectation.[3] The petitioner here has constructed the improvements and seeks only their fair market value. *Petty Motor* should not be

improvements are to be valued, not over whether Almota is to receive additional compensation for business losses. Almota may well be unable to operate a grain elevator business elsewhere; it may well lose the profits and other values of a going business, but it seeks compensation for none of that. *Mitchell* v. *United States,* 267 U. S. 341, did hold that the Government was not obliged to pay for business losses caused by condemnation. But it assuredly did not hold that the Government could fail to provide fair compensation for business improvements that are taken—dismiss them as worth no more than scrap value—simply because it did not intend to use them. Indeed, in *Mitchell* the Government paid compensation both for the land, including its "adaptability for use in a particular business," *id.,* at 344, and for the improvements thereon.

[3] Hence, this is not a case where the petitioner is seeking compensation for lost opportunities, see *United States ex rel. TVA* v. *Powelson,* 319 U. S. 266, 281–282; *Omnia Commercial Co.* v. *United States,* 261 U. S. 502. The petitioner seeks only the fair value of the property taken by the Government.

Nor is this a case where compensation is to be paid for "the value added to fee lands by their potential use in connection with [Government] permit lands," *United States* v. *Fuller, post,* p. 488, at 494, for neither action by the Government nor location adjacent to public property contributed any element of value to Almota's leasehold interest.

read to allow the Government to escape paying what a willing buyer would pay for the same property.

The Government argues that it would be unreasonable to compensate Almota for the value of the improvements measured over their useful life, since the Government could purchase the fee and wait until the expiration of the lease term to take possession of the land.[4] Once it has purchased the fee, the argument goes, there is no further expectancy that the improvements will be used during their useful life since the Government will assuredly require their removal at the end of the term. But the taking for the dam was one act requiring proceedings against owners of two interests.[5] At the time of that "taking" Almota had an expectancy of continued occupancy of its grain elevator facilities. The Government must pay just compensation for those interests "probably within the scope of the project from the time the

---

[4] It was established at oral argument that while the Government had contracted to acquire the railroad's interest, it had not acquired the fee at the time of the taking of the leasehold, nor did it have possession at the time of the trial or appeal.

[5] "It frequently happens in the case of a lease for a long term of years that the tenant erects buildings or puts fixtures into the buildings for his own use. Even if the buildings or fixtures are attached to the real estate and would pass with a conveyance of the land, as between landlord and tenant they remain personal property. In the absence of a special agreement to the contrary, such buildings or fixtures may be removed by the tenant at any time during the continuation of the lease, provided such removal may be made without injury to the freehold. This rule, however, exists entirely for the protection of the tenant, and cannot be invoked by the condemnor. If the buildings or fixtures are attached to the real estate, they must be treated as real estate in determining the total award. But in apportioning the award, they are treated as personal property and credited to the tenant." 4 P. Nichols, Eminent Domain § 13.121 [2] (3d rev. ed. 1971) (footnotes omitted).

Government was committed to it." *United States* v. *Miller,* 317 U. S., at 377. Cf. *United States* v. *Reynolds,* 397 U. S., at 16–18. It may not take advantage of any depreciation in the property taken that is attributable to the project itself. *Id.,* at 16; *United States* v. *Virginia Electric & Power Co.,* 365 U. S., at 635–636. At the time of the taking in this case, there was an expectancy that the improvements would be used beyond the lease term. But the Government has sought to pay compensation on the theory that at that time there was no possibility that the lease would be renewed and the improvements used beyond the lease term. It has asked that the improvements be valued as though there were no possibility of continued use.[6] That is not how the market would have valued such improvements; it is not what a private buyer would have paid Almota.

"The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, *United States* v. *Commodities Trading Corp.,* 339 U. S. 121, 124 (1950), as it does from technical concepts of property law." *United States* v. *Fuller, post,* at 490. It is, of course, true that Almota should be in no better position than if it had sold its leasehold to a private buyer. But its position should surely be no worse.

The judgment before us is reversed and the judgment of the District Court reinstated.

---

[6] Similarly, the dissent today would value the petitioner's interest after the Government has condemned the underlying fee, and thus after the value of the petitioner's interest has been diminished because the risk of nonrenewal of the lease has materialized. But there was only one "taking," and at the time of that "taking" there was not only a risk that the lease would not be renewed, but a possibility that it would be and that the improvements would be used over their useful life.

Mr. Justice Powell, with whom Mr. Justice Douglas joins, concurring.

I join the opinion of the Court, but add a few words to indicate what I find implicit in its rejection of the Government's claim to act as if it were Almota's landlord.

It is clear, first of all, that the market value of improvements placed on a leasehold interest will vary depending in major part upon the probable future conduct of the landlord. In this case, based on the experience of nearly half a century and the evident self-interest of the landlord railroad, this conduct could be predicted with considerable confidence. There was every expectation that the improvements would continue to have significant value beyond the term of the present lease. In a transaction between a willing buyer and a willing seller, there can be no doubt that this value would have been accorded appropriate weight.

On different facts, the market value of Almota's interest might have been significantly lower. If, for example, the railroad had relocated its tracks before the Government entered the picture, the leasehold improvements would have been nearly valueless in the market. A risk which Almota took in erecting those improvements, the risk that the railroad would relocate its tracks, would have proved a poor one. The risk would have been substantially the same if, independently of the present navigation project, the Government had purchased the railroad with the intention of operating it, and thereafter had decided to relocate it or to discontinue operation. Under those circumstances, the Government could properly have acted as an ordinary landlord, and its lessees could have been expected to bear the risk that it would put its land to a new use.

Here, however, the Government held no interest in the land until its navigation project required the acquisition of both the fee and the leasehold interests. If, at that

point, the Government had condemned both interests in a single proceeding, or in separate proceedings, Almota would have been entitled to compensation for the value of the improvements beyond the present lease term. Almota bore the risk that the railroad would change its plans, but should not be forced to bear the risk that the Government would condemn the fee and change its use. Where multiple properties or property interests are condemned for a particular public project, the Government must pay *pre-existing market value for each.* Neither the Government nor the condemnee may take advantage of "an alteration in market value attributable to the project itself." *United States* v. *Reynolds,* 397 U. S. 14, 16 (1970); cf. *United States* v. *Virginia Electric & Power Co.,* 365 U. S. 624, 635–636 (1961); *United States* v. *Miller,* 317 U. S. 369, 377 (1943).

The result should not be different merely because the Government arranged to acquire the fee interest by negotiation rather than by condemnation. Apart from cases where, as in *United States* v. *Rands,* 389 U. S. 121 (1967), the Government has a property interest antedating but within the bounds of its present project, it would be unjust to allow the Government to use "salami tactics" to reduce the amount of one property owner's compensation by first acquiring an adjoining piece of property or another interest in the same property from another property owner. While *United States* v. *Petty Motor Co.,* 327 U. S. 372 (1946), arguably establishes an exception to this principle, I subscribe to the Court's narrow construction of that case.

Mr. Justice Rehnquist, with whom The Chief Justice, Mr. Justice White, and Mr. Justice Blackmun join, dissenting.

Petitioner is entitled to compensation for so much of its private "property" as was taken for public use.

The parties concede that petitioner's property interest here taken was the unexpired portion of a 20-year lease on land owned by the Oregon-Washington Railroad & Navigation Co. near Colfax, Washington. The Court recognizes the limited nature of petitioner's interest in the real property taken, but concludes that it was entitled to have its leasehold and improvements valued in such a way as to include the probability that petitioner's 20-year lease would have been renewed by the railroad at its expiration.

There is a plausibility about the Court's resounding endorsement of the concept of "fair market value" as the touchstone for valuation, but the result reached by the Court seems to me to be quite at odds with our prior cases. Even in its sharply limited reading of *United States* v. *Petty Motor Co.,* 327 U. S. 372 (1946), the Court concedes that the petitioner's expectation of having its lease renewed upon expiration is not itself an interest in property for which it may be compensated. But the Court permits the same practical result to be reached by saying that, at least in the case of improvements, the fair market value may be computed in terms of a willing buyer's expectation that the lease would be renewed.

In *United States* v. *Petty Motor Co., supra,* the Government acquired by condemnation the use of a structure occupied by tenants in possession under leases for various unexpired terms. The Court held that the measure of damages for condemnation of a leasehold is the value of the tenant's use of the leasehold for the remainder of the agreed term, less the agreed rent. The Court considered the argument, essentially the same raised by petitioner here, that a history of past renewal of the leases to existing tenants creates a compensable expectancy, but held that the right to compensation should be measured solely on the basis of the remainder

of the tenant's term under the lease itself. *Id.,* at 380. In so deciding, the Court stated:

"The fact that some tenants had occupied their leaseholds by mutual consent for long periods of years does not add to their rights. *Emery* v. *Boston Terminal Co.,* 178 Mass. 172, 185, 59 N. E. 763 [per Holmes, C. J.] :

" 'It appeared that the owners had been in the habit of renewing the petitioners' lease from time to time . . . . Changeable intentions are not an interest in land, and although no doubt such intentions may have added practically to the value of the petitioners' holding, they could not be taken into account in determining what the respondent should pay. They added nothing to the tenants' legal rights, and legal rights are all that must be paid for. Even if such intentions added to the saleable value of the lease, the addition would represent a speculation on a chance, not a legal right.' " *Id.,* at 380 n. 9.

The holding in *Petty* was consistent with a long line of cases to the effect that the Fifth Amendment does not require, on a taking of a property interest, compensation for mere expectancies of profit, or for the frustration of licenses or contractual rights that pertain to the land, but that are not specifically taken and that are not vested property interests. *Omnia Commercial Co.* v. *United States,* 261 U. S. 502, 510 (1923); *Sinclair Pipe Line Co.* v. *United States,* 152 Ct. Cl. 723, 728, 287 F. 2d 175, 178 (1961); *Chicago, M., St. P. & P. R. Co.* v. *Chicago, R. I. & P. R. Co.,* 138 F. 2d 268, 270–271 (CA8 1943), cert. denied, 320 U. S. 804 (1944).

While the inquiry as to what property interest is taken by the condemnor and the inquiry as to how that property interest shall be valued are not identical ones, they

cannot be divorced without seriously undermining a number of rules dealing with the law of eminent domain that this Court has evolved in a series of decisions through the years. The landowner, after all, is interested, not in the legal terminology used to describe the property taken from him by the condemnor, but in the amount of money he is to be paid for that property. It will cause him little remorse to learn that his hope for a renewal of a lease for a term of years is not a property interest for which the Government must pay, if in the same breath he is told that the lesser legal interest that he owns may be valued to include the hoped-for renewal.

The notion of "fair market value" is not a universal formula for determining just compensation under the Fifth Amendment. In *United States* v. *Miller,* 317 U. S. 369, 374 (1943), the Court said of market value:

> "Respondents correctly say that value is to be ascertained as of the date of taking. But they insist that no element which goes to make up value as at that moment is to be discarded or eliminated. We think the proposition is too broadly stated."

It is quite apparent that the property on which the owner operates a prosperous retail establishment would command more in an open market sale than the fair value of so much of the enterprise as was "private property" within the meaning of the Fifth Amendment. Yet *Mitchell* v. *United States,* 267 U. S. 341 (1925), stands squarely for the proposition that the value added to the property taken by the existence of a going business is no part of the just compensation for which the Government must pay for taking the property:

> "No recovery therefor can be had now as for a taking of the business. There is no finding as a fact that the Government took the business, or that what it did was intended as a taking. If the

business was destroyed, the destruction was an unintended incident of the taking of land." *Id.,* at 345.

More recently, in *United States ex rel. TVA* v. *Powelson,* 319 U. S. 266, 283 (1943), the Court generalized further:

"That which is not 'private property' within the meaning of the Fifth Amendment likewise may be a thing of value which is destroyed or impaired by the taking of lands by the United States. But like the business destroyed but not 'taken' in the *Mitchell* case it need not be reflected in the award due the landowner unless Congress so provides."

In either *Mitchell* or *Powelson,* the result would in all probability have been different had the Court applied the reasoning that it applies in this case. Here, too, the improvements on the property are not desired by the Government for the project in question, but the taking of petitioner's leasehold interest prevents its continuing to have their use for the indefinite future as it had anticipated. The Court says that although its "property" interest would have expired in 7½ years, the market value of that interest may be computed on the basis of expectancies that do not rise to the level of a property interest under the Fifth Amendment.

If permissible methods of valuation are to be thus totally set free from the property interest that they purport to value, it is difficult to see why the same standards should not be applied to a going business. Although the Government does not take the going business, and although the business is not itself a "property" interest within the Fifth Amendment, since purchasers on the open market would have paid an added increment of value for the property because a business was located on it, it may well be that such increment of value is

properly included in a condemnation award under the Court's holding today. And it will assuredly make no difference to the property owner to learn that destruction of a going business is not compensable, if he be assured that the property concededly taken upon which the business was located may be valued in such a way as to include the amount a purchaser would have paid for the business.

The extent to which the Court's decision in this case will unsettle condemnation law is obscured by the fact that the parties, motivated no doubt by condemnation lawyers' well-known propensity to enter into factual stipulations that present abstract questions of valuation theory for decision, have stipulated as to amounts to be awarded depending on which party prevails. But the underlying difficulty with petitioner's theory was lucidly demonstrated by the late Judge Madden in his opinion for the Court of Appeals in this case, referring to the similar holding of the Court of Appeals for the Tenth Circuit in *Scully* v. *United States,* 409 F. 2d 1061 (1969):

> "If the law were to go into the business of awarding compensation for an expectancy which never materialized, because the sovereign 'took' the subject of the expectancy, should, in *Scully, supra,* e. g., the one year lessees be compensated for the loss of a five year occupancy, a 50 year occupancy, a perpetual occupancy? In our instant case, was the stipulation based upon some actuarial computation such as the prospective life of the buildings and machinery, or the life of the railroad, or upon free-ranging guesswork?" *United States* v. *22.95 Acres of Land,* 450 F. 2d 125, 129 (CA9 1971).

The Court's conclusion gains no support from its citation of the recognized principle that the Government

may not take advantage of any depreciation in the property taken that is attributable to the project itself, *United States* v. *Reynolds,* 397 U. S. 14 (1970); *United States* v. *Miller,* 317 U. S. 369 (1943). The value of petitioner's property taken could not be diminished by the fact that the river improvement and navigation for which the Government took its property might have had a depressing effect on pre-existing market value. But the Government makes no such contention here. While, under existing principles of constitutional eminent domain law, the value of petitioner's property was not subject to diminution resulting from the effect on market value of the improvement that the Government proposed to construct, it *was* subject to the hazard of nonrenewal of petitioner's leasehold interest. The fact that the Government has condemned the underlying fee for the same project, and has therefore made the risk of nonrenewal a certainty, undoubtedly diminishes the market value of petitioner's leasehold interest. But the diminution results, not from any depressing effect of the improvement that the Government will construct after having taken the leasehold, but from a materialization of the risk of transfer of ownership of the underlying fee to which its value was always subject.

In at least partially cutting loose the notion of "just compensation" from the notion of "private property" that has developed under the Fifth Amendment, the Court departs from the settled doctrine of numerous prior cases that have quite rigorously adhered to the principle that destruction of value by itself affords no occasion for compensation. *United States* v. *Fuller, post,* p. 488; *United States* v. *Rands,* 389 U. S. 121 (1967). "[D]amage alone gives courts no power to require compensation where there is not an actual taking of property." *United States* v. *Willow River Power Co.,* 324 U. S. 499, 510 (1945). "[T]he existence of value alone

does not generate interests protected by the Constitution against diminution by the government . . . ." *Reichelderfer* v. *Quinn*, 287 U. S. 315, 319 (1932). While the Court purports to follow this well-established principle by requiring the compensation paid to be determined on the basis of private property actually taken, its endorsement of valuation computed in part on an expectancy that is no part of the property taken represents a departure from this settled doctrine. I therefore dissent.