UNITED STATES of America

v.

**8.41 ACRES OF LAND, SITUATE IN ORANGE COUNTY, TEXAS, KWW Associates, et al.**

UNITED STATES of America

v.

**5.00 ACRES OF LAND, SITUATE IN OR-ANGE COUNTY, TEXAS, The Fire-stone Tire & Rubber Co., et al.**

UNITED STATES of America

v.

**6.90 ACRES OF LAND, SITUATE IN OR-ANGE COUNTY, TEXAS, The Fire-stone Tire & Rubber Co., et al.**

Civ. A. Nos. B–78–169–CA–1547–3, B–78–170–CA–1547–3 and B–78–176–CA–1547–3.

United States District Court, E.D. Texas, Beaumont Division.

May 13, 1983.

George Phair, Asst. U.S. Atty., Beaumont, Tex., Tom Carolan, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

George W. Brown, Jr., Beaumont, Tex., for defendants.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

This land condemnation case is before the court on remand from the Court of Appeals for the Fifth Circuit. That court reversed the compensation award of the district court and remanded "for determination of the fair market value, with instructions to rely upon the evidentiary record as it presently exists." *United States v. 8.41 Acres of Land, etc.,* 680 F.2d 388, 395 (5th Cir.1982).

## I. BACKGROUND

The Government took easements for the construction of pipelines for the Strategic Petroleum Reserve program. From two tracts owned by The Firestone Tire and Rubber Company (Firestone), the Government took 6.9 acres. From an adjacent tract owned by KWW Associates (KWW), it took 5.3 acres. The Department of Energy (DOE) placed a 42 inch pipeline in the easement.

The court appointed a three-man condemnation commission to determine awards for the takings of perpetual, assignable, 50 foot easements for multiple pipelines and 25 foot "temporary work easements" of three years duration. After consolidating the actions for trial, the court affirmed the awards of the commission and entered judgments of $164,611 for Firestone and $96,200 for KWW. *United States v. 5.00 Acres Of Land, etc.,* 507 F.Supp. 589 (E.D. Tex.1981).

The Government appealed the compensation awards. It argued that the district court erred in accepting the findings of the commission that:

(1) the pipeline easements were "effectively severed" from the parent tracts;

(2) the "before-and-after" method of valuation was therefore inappropriate;

(3) the highest and best use of the taken land was as a "pipeline corridor;" and that

(4) the appropriate comparable sales by which fair market value should be determined were other sales of pipeline easements.

Those findings were based primarily upon evidence presented by the landowners.

In reaching its conclusions, the commission heard and considered contrary evidence and argument presented by the Government that:

(1) the taken land was not "severed" from the 252 acre, 340 acre, and 175 acre parent tracts;

(2) for such a "partial taking," the "before-and-after" method of valuation was proper;

(3) the highest and best use of the land taken was for "industrial sites;" and that

(4) the appropriate comparable sales by which fair market value should be determined were sales of "industrial sites" in the general vicinity at the time of the taking.

All evidence introduced by the Government was ostensibly consistent with the above theory.

Embracing the argument of the Government, the Court of Appeals rejected the commission's fact findings on use and value as "clearly erroneous." The court believed that "in contrast," the Government's "characterization of use and value was appropriate and proper." *United States v. 8.41 Acres Of Land, etc.,* 680 F.2d 388, 395 (5th Cir.1982).

The testimony of valuation witnesses did not, strictly speaking, conflict directly, because the parties had presented their cases under different theories of valuation. The

experts' estimates of damages to the landowners, however, differed by a factor of six. Nevertheless, the Court of Appeals concluded that the Government's estimate of damages to the landowners was not only "appropriate," but "uncontested," as well. *Id.* In fact, the landowners' expert testified that damages to Firestone exceeded $164,611 and to KWW, $96,200; in contrast, the Government's evidence indicated damages to Firestone of $27,936 and to KWW, $20,178.

The Court of Appeals noted that the landowners had presented evidence under an "unorthodox theory," *id.* at 391, erroneously accepted by the district court. Reasoning that the landowners had already been given an opportunity to be heard on the issue of damages and had failed to meet their burden, the court concluded that due process requirements had been met. Accordingly, the court indicated "it is unnecessary to conduct additional hearings on determining the fair market value of the parcels." *Id.*

While the district court realized that further hearings were not absolutely necessary in determining the fair market value of the parcels, it ordered them nonetheless. The court believed that fundamental principles of due process and fairness required that the landowners be given a reasonable chance to protect their property interests against the coerced taking by the Government. Moreover, the court discerned no harm in additional hearings.

The court ordered a hearing for October 24, 1982 on the parties' motions for awards of just compensation and entry of judgment according to the mandate of the Court of Appeals. The court feared that the landowners had been penalized for relying on an "unorthodox theory" in previous proceedings. Out of a sense of fairness and an abundance of precaution, the court gave all the parties an opportunity to offer additional evidence at the hearing. The Government strongly objected. It argued that the court was forbidden to consider any evidence of fair market value except that already presented by the Government.

Accordingly, the Government refused to offer additional evidence at the hearing and objected to testimony by the landowners' experts. The landowners offered evidence which reinforced evidence in the record that a pipeline corridor existed in the area. They also presented evidence showing that the Government's perpetual, assignable right to lay multiple pipelines damaged their property more than an ordinary pipeline easement.

Following a careful review of the evidentiary record in light of the mandate of the Court of Appeals, the court determined that further clarification and interpretation of the existing evidence would be helpful. The court ordered a final hearing for February 24, 1983, inviting the parties to present argument and testimony "based on the existing evidentiary record," as to the "before-and-after" values of the tracts.

On February 8, 1983 the Government petitioned the Court of Appeals for a writ of mandamus to this court. The petition alleged that the district court violated the mandate of the Court of Appeals by ordering the hearings. In its order denying the petition, the Court of Appeals reiterated the command of the mandate: "that the record was to be considered closed, and judgment was to be entered in accordance with the Government's theory of valuation on the Government's evidence of comparable sales for industrial plant sites." *In re United States of America*, no. 83–2080 (5th Cir. Feb. 22, 1983).

At the final hearing the Government insisted that the landowners were not entitled to another opportunity—having "waived" their first by relying on their "unorthodox theory"—to present evidence contesting the Government's valuations. Accordingly, the Government declined to provide clarification or interpretation of its evidence and objected to the landowners' efforts. Willard J. Hall testified for the landowners, reviewing the testimony of the Government's expert witness, Jack Aulbaugh, before the commission. Hall explained that some of the comparable sales offered by the Government were largely

marshland or in the flood plain, unlike the landowners' tracts. He expressed his opinions of the "before-and-after" values of the tracts, as well.

The court has diligently reviewed the record, the briefs of the parties, and the opinion and mandate of the Court of Appeals. The court is of the opinion that the two hearings described above did not aid the court in determining the damage done to the landowners by the Government. The testimony at the hearings did not help the court determine the "before-and-after" values of the tracts because it did not address the proper theory of valuation. At most, the hearings merely created the appearance that the landowners received due process of law, in spite of the Government's repeated and inexplicable objections. By necessity, the court relies on the pre-hearings evidence introduced by the Government to determine the two *distinct* elements of just compensation due the landowners: damages for the permanent partial taking, the actual pipeline easement; and damages for the temporary occupancy, the work easement.

## II. HIGHEST & BEST USE VALUATION BASED ON COMPARABLE SALES

In endorsing the evidence and valuation theory presented by the Government, the Court of Appeals ostensibly approved Aulbaugh's estimates of damages to the landowners. While the district court is duty bound upon remand of a case to proceed in accord with the mandate and such law of the case as was established by the appellate court, *see e.g., Conway v. Chemical Leaman Tank Lines, Inc.,* 87 F.R.D. 712, 715 (E.D.Tex.1980), *aff'd* 644 F.2d 1059 (5th Cir.1981), *reh'g denied* 650 F.2d 282, the court does not understand the mandate or the opinion to require the court to perfunctorily and indiscriminately adopt all the conclusions of the Government's valuation expert. Moreover, such conclusions as are not supported by the evidence or as are incompatible with the law of the case must

surely be rejected. A review of the Government's valuation evidence follows.

The Government valuation witness opined that the highest and best use of the parent tracts was as "industrial tracts .... compatible with the uses in the neighborhood." In estimating the values of the tracts, he relied on five comparable sales of "industrial sites" in the area. They ranged in value from $2,000 to $6,000 per acre.

Two of the comparable sales were at substantially lower values than the others. Presumably, Aulbaugh considered the physical differences between the comparable sales and the damaged tracts, making allowances for marshy conditions and the likelihood of flooding.

The highest comparable sale, $6,000 per acre, occurred some 2.5 years before the taking. He did not adjust that price to allow for the rise in land prices during the intervening period. Aulbaugh regarded it as superior to the Firestone and KWW tracts because the tract was on the Neches River and near Interstate 10.

While it is surely a mere coincidence, it is interesting that Aulbaugh's opinion of the average per acre fair market value of the subject tracts, $3,500, barely differs from the average value of his five comparable sales: $3,463.80 per acre.

■ The Government purported to be, and perhaps believed that it was, properly utilizing the "before-and-after" method of valuation in determining just compensation to the landowners. That method "computes damages to be the difference in value of the entire tract before the taking and the value of the portion remaining after the taking." *U.S. v. 8.41 Acres of Land, etc.,* 680 F.2d 388, 392 n. 5 (5th Cir.1982). *See also U.S. v. 158.24 Acres of Land, etc.,* 515 F.2d 230, 233 (5th Cir.1975); *Transwestern Pipeline Co. v. O'Brien,* 418 F.2d 15, 21 (5th Cir.1969).

■ Aulbaugh said that his compensation figures equalled the difference between the fair market values of the tracts immediately before and immediately after the acquisition of the easements. He ex-

plained, however, that the figures included compensation not only for the permanent pipeline easements, but for the temporary work easements, as well.

Moreover, Aulbaugh derived his compensation figures, *before* he established the "after taking" values. Indeed, his "after taking" values were derived not on the basis of the valid comparable sale in evidence, but by subtracting the improperly derived combined damage elements from the valid "before taking" values of the parent tracts.

He did this by, first, valuing the actual area of the permanent easements taken at the parent tracts' average per acre "before taking" value of $3,500, reduced by 10% for rights remaining in the landowners after the taking. Second, he diminuted the remaining property by $1,120 per acre *of* temporary work easement. He allowed an additional $3,500 of "severance damages" to the Firestone property because the pipeline separated two acres from one parent tract, making that area useless as an industrial site. Third, Aulbaugh combined the above figures, and then backed his way into the "before-and-after" formula—subtracting the remainder from the minuend in order to derive the subtrahend, a technique akin to defining one's minor premise in order to support a preconceived conclusion.

Although the Government couched its presentation in the language of "before-and-after" valuation, Aulbaugh did not use that method to determine just compensation. To the contrary, the Government expert used a second method, required under Texas law, allowed in the Fourth Circuit, but forbidden in the Fifth Circuit:

> * * * awarding the fair market value of the *strip actually taken,* plus damages for any diminution in value of the landowner's remaining property by virtue of the severance or use to which the strip taken is to be put * * * [citations omitted].

The applicable federal law in the Fifth Circuit, however, requires the *exclusive* use of the before-and-after method of valuation * * *

*U.S. v. 8.41 Acres of Land, etc.,* 680 F.2d 388, 392 n. 5 (5th Cir.1982). Accordingly, the court is compelled to reject the opinion of the Government's expert as to just compensation because he failed to use the "before-and-after" method of valuation. Moreover, Aulbaugh's expressed opinion of the value of the parent tracts *after* the taking was not based on evidence of a valid comparable sale; the court therefore finds that his opinion is not credible as to the "after taking" values. The court does not, however, reject the Government's evidence of comparable sales or the opinion of its expert as to the fair market value of the parent tracts *before* the taking. The court relies on the latter evidence, as explained below, to "properly determine compensation by comparing the fair market value of the parent tracts 'before-and-after' the taking." *Id.* at 394.

## III. JUST COMPENSATION FOR THE PERMANENT EASEMENTS TAKEN

The evidence introduced by the Government supports the opinion of their expert that the average per acre value of the tracts *before* the taking was $3,500. The expert cited a comparable sale of an industrial site not burdened with permanent easements for $3,615 per acre. The only evidence of the average value per acre *after* the taking conclusively establishes a reduced value. The Government evidence shows that a comparable sale of an industrial tract similar in size and location to the latter tract, but burdened with a public utility company right of way along its frontage, brought only $3,150 per acre.

Those valid comparable sales of industrial property in the area at the time of the taking conclusively establish an *"after taking"* average value per acre that is $465 less than the value of like property *before* such taking.

Moreover, the particular comparable sale indicative of the "after taking" value of the tracts involves an easement remarkably analogous to the DOE pipeline easement, although not as invasive. The Gulf States easement, like the DOE pipeline easement,

is perpetual and forecloses the possibility of construction thereon. It almost certainly entails the right to install an unlimited number of additional or larger lines, as well as the right to replace already existing ones. In this respect both the Gulf States right of way and the DOE pipeline easement most markedly differ from the ordinary pipeline easement wherein each replacement or addition of a line requires compensation of the landowner. It is precisely those elements—the *perpetual right* to install *unlimited lines* through the easement—that make the DOE pipeline easement most damaging to a landowner, in contrast to a conventional pipeline easement involving only one line and no future invasions of the property. The Gulf States easement is less invasive than the DOE pipeline easement because any future line installation will be overhead, while DOE cannot install additional lines without actually blocking surface access to the tract for extended periods of time.

Because the existing pipeline easements on the Firestone tracts are of the conventional type and do not allow for future uncompensated invasions of the property, the court accepts the opinion of the Government's expert witness that the Firestone tracts have average per acre values equal to the KWW tract.

Based upon the evidence of comparable sales presented by the Government, the court finds that:

(1) the average per acre value of the parent tracts *before* the taking of the perpetual, assignable, multiple pipeline easement by DOE was $3,500; and

(2) the average per acre value of the parent tracts *after* the taking was $3,035. In the table below, these values are applied to the areas of the damaged tracts.

The above findings of fact are solidly and exclusively grounded upon the Government's evidence in the record. The open-ended nature of the DOE pipeline easement—the perpetual, assignable right to lay unlimited pipelines—is such a burden on the land as to sharply reduce the value of the parent tracts. DOE or an assignee can at any and all times construct additional pipelines or replace existing ones. Necessarily, there is no longer assured access to the tracts from Highway 1006. While the Firestone and KWW tracts were each accessible from two highways before the taking, each now has assured access from but one. Indeed, the Firestone tracts lost half their useful highway frontage because of the taking.

## IV. JUST COMPENSATION FOR THE TEMPORARY EASEMENTS TAKEN

The remaining element of damages is for the temporary taking of work easements adjacent to the 50 foot pipeline easement. DOE took 1.96 and 2.78 acre work easements on the Firestone tracts, and on the KWW tract, a 3.11 acre work easement. As explained above, the Government attempted to use the "before-and-after" method to determine damages for the temporary takings along with the permanent ones.

■ For a temporary occupancy, the proper measure of damages is the rental value of the property taken. *Kimball Laundry Co. v. U.S.*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1948). That damage rule is appropriate here because DOE took the right to occupy and use additional land for a three year period. DOE styled the taken property right a "temporary work easement," but it was entitled to virtually unrestricted surface use of the area for three years just as if it had acquired a leasehold.

The "before-and-after" method prescribed by the Court of Appeals for the permanent partial taking, i.e., the pipeline easement itself, is totally inappropriate for the calculation of damages from a temporary taking. In explicitly rejecting that method, the Court observed in *Kimball Laundry* that

* * * if the difference between the market value of the fee on the date of the taking and that on the date of return were taken to be the measure, there might frequently be situations in which

the owner would recover no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy. *Id.* at 7, 69 S.Ct. at 1438. In prescribing rental value as the exclusive measure of damages for temporary takings, the Court explained that "determination of the value of temporary occupancy can be approached only on the supposition that free bargaining between [the owner] and a hypothetical lessee of that temporary interest would have taken place in the usual framework of such negotiations." *Id.*

The equitable principle enunciated in *Kimball Laundry* was reiterated by the Court in a later case involving the taking of a leasehold. The principle, simply stated, is this: the Government should not be allowed to escape paying what a willing buyer would pay for the same property. *See Almota Farmer's Elevator and Warehouse Co. v. U.S.,* 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1972). This notion is implicit in the "unorthodox theory" presented by the landowners and is noticeably absent from the Government position in this case. Although the Government did not introduce evidence showing what a willing buyer would pay to rent the work easement, neither did the landowners. The landowners simply failed to take the precaution of presenting evidence under the conventional, accepted theory of valuation in this Circuit.

█ It is true that both parties presented evidence of what a willing buyer would pay for the same property, if the same property is defined as pipeline easements. The Government expert noted sales around $13,000 per acre and the landowners' ex-pert described a price range from $13,000 to $52,000 per acre with most sales at $19,000 per acre of pipeline easement. Even though sales of pipeline easements are not evidence of valid comparable sales and cannot be used in determining the value of the permanent taking, the sales included compensation for a temporary work easement. Had the experts testified as to the percentage of the price attributable to the work easement, the court would have had evidence of the rental value of the property temporarily taken. No such evidence was presented however, and the court must rely instead on the approach expounded by the Government.

The Government method of determining the value of the temporary taking was to apply a 13.5% rate of return to the average value per acre of the parent tracts times the acreage of the temporary work easements, discounted to present value. The product of that computation equals 32% of the work easement land value. In the absence of evidence to the contrary, the court accepts the computed value as a reasonable approximation of the rental value of the temporary taking. The Government valuation expert's 32% factor is applied to the average per acre *"after* taking" value of the parent tracts to determine the rental value of the temporary work easements, as shown in the table below.

## V. JUST COMPENSATION CALCULATIONS

Applying the evidence discussed above to the prescribed theories of valuation, the court finds that the just compensation for the takings is as set forth below:

### A. FIRESTONE PROPERTY

Parent Tract 338 = 252 acres

1. Sub-tract E–1 (3.8 acres permanent, assignable, multiple pipeline easement)

Fair Market Value Before Taking
252 acres @ $3,500/acre =                    $ 882,000.00
Fair Market Value After Taking
252 acres @ $3,035/acre =                    –764,820.00
Just Compensation for Permanent Taking                       $ 117,180.00

2. Sub-tract E–2   (2.78 acres temporary work easement)

Fair Rental Value of Temporary Taking
   2.78 acres @ $3,035/acre × 0.32 =                                    2,699.94

Parent Tract 314 = 340 acres

1. Sub-tract E–3   (3.05 acres permanent, assignable, multiple pipeline easement)

Fair Market Value Before Taking
   340 acres @ $3,500/acre =                    $1,190,000.00
Fair Market Value After Taking
   340 acres @ $3,035/acre =                    −1,031,900.00
Just Compensation for Permanent Taking                              158,100.00

2. Sub-tract E–4   (1.96 acres temporary work easement)

Fair Rental Value of Temporary Taking
   1.96 acres @ $3,035/acre × 0.32 =                          +   1,903.55

TOTAL COMPENSATION DUE FIRESTONE ON DATE OF TAKING   $ 279,883.49
LESS:  Estimated Compensation Deposited into
        Registry of the Court                                 − 18,964.00
DEFICIENCY DUE FIRESTONE as of March 7, 1978                 $ 260,919.49
PLUS:  Accrued Interest on Deficiency to Date               +179,098.12
TOTAL DEFICIENCY + INTEREST as of May 13, 1983              $ 440,017.61

B.  KWW PROPERTY

Parent Tract 313 = 175 acres

1. Sub-tract E–1   (5.3 acres permanent, assignable, multiple pipeline easement)

Fair Market Value Before Taking
   175 acres @ $3,500/acre =                    $ 612,500.00
Fair Market Value After Taking
   175 acres @ $3,035/acre =                    −531,125.00
Just Compensation for Permanent Taking                      $  81,375.00

2. Sub-tract E–2   (3.11 acres temporary work easement)

Fair Rental Value of Temporary Taking
   3.11 acres @ $3,035/acre × 0.32 =                          +   3,020.43

TOTAL COMPENSATION DUE KWW ON DATE OF TAKING               $  84,395.43

LESS:  Estimated Compensation Deposited into
        Registry of the Court                                 − 30,888.00
DEFICIENCY DUE KWW from & including March 7, 1978           $  53,507.43
PLUS:  Accrued Interest on Deficiency to Date               +  36,728.11
TOTAL DEFICIENCY + INTEREST as of May 13, 1983             $  90,235.54

## VI.   CONCLUSION

In granting the landowners' Motion for Award of Interest, the court acknowledged that the Fifth Amendment requires the payment of interest as an element of just compensation where the date of the taking precedes the payment of the award. *U.S. v. 5.00 Acres of Land, etc.*, 507 F.Supp. 589, 598–99 (E.D.Tex.1981). The court then awarded the landowners interest on the deficiency at the interest rate "applicable to three-year Treasury bonds purchased on the date of taking," it having been al-most three years since the taking. Inasmuch as the judgment of the district court was reversed on other grounds and another 28 months have elapsed since the motion was granted, the court awards interest on the deficiencies as follows:

(1) at the rate applicable to Treasury notes issued nearest the date of taking, to wit, 7.875%, for the three year period beginning March 7, 1978;

(2) at the rate applicable to Treasury notes issued nearest March 7, 1981, to wit,

13.75%, for the period beginning that date until the payment of the award; and

(3) since interest on the Treasury notes is payable semi-annually, the interest on the deficiencies shall be compounded semi-annually.

Judgment will be entered in favor of the defendants, THE FIRESTONE TIRE & RUBBER CO. and KWW ASSOCIATES, for compensation and interest according to this opinion and as more fully described in the Final Judgment entered this date, and it is, furthermore

ORDERED, ADJUDGED, and DE-CREED that the Amended Report and Findings of the Condemnation Commission, except as modified in this Memorandum Opinion, is otherwise approved, ratified, and adopted.