A.A. PROFILES, INC., Plaintiff-Appellant,

v.

The CITY OF FORT LAUDERDALE, Defendant-Appellee.

No. 99-14762.

United States Court of Appeals,

Eleventh Circuit.

June 5, 2001.

Appeal from the United States District Court for the Southern District of Florida. (No. 81-06424-CV-NCR), Norman C. Roettger, Jr., Judge.

Before WILSON, KRAVITCH and COX, Circuit Judges.

COX, Circuit Judge:

We have for review A.A. Profiles, Inc.'s ("Profiles") appeal of the district court's judgment finding that the City of Fort Lauderdale (the "City") "took" Profiles's property in violation of the Fifth and Fourteenth Amendments but declining to award any damages.

*Background*[1]

In 1979, Profiles contracted to purchase a parcel in northwest Fort Lauderdale, Florida. The parcel's zoning was the City's least restrictive industrial and manufacturing classification. Despite its zoning classification, the tract was bordered to the west and south by residential development. Profiles's plan was to establish a wood-chipping business on the site. Because of economic factors at the time, it had become prohibitively expensive to truck organic waste such as tree limbs to more remote landfills. Profiles sought to take advantage of this opportunity by offering a local site for organic waste to be processed. The company also planned to profit from the sale of mulch and wood chips for landscaping and other uses. The City Commission unanimously approved the development. In exchange for the City's permission to operate the business, Profiles promised to construct a ten-foot high concrete wall around the property before beginning chipping operations.

After receiving the City's approval of its plan, Profiles completed the purchase of the property. The purchase price of the property was $3,290,955.62 of which Profiles paid a $25,000 downpayment. The

---

[1]The following facts are drawn from our previous opinion, *A.A. Profiles, Inc. v. City of Fort Lauderdale,* 850 F.2d 1483 (11th Cir.1988), the district court's order granting final judgment, and undisputed facts in the record.

remainder of the purchase price was financed. Profiles executed two mortgages on the property, one held by the seller and one held by Landmark First National Bank. Profiles then acquired building permits and began to improve the property by clearing it and starting construction of the wall that was to surround the property. Before the wall was complete or the chipping machinery in place, Profiles contacted the City's Chief Building Inspector and asked to be allowed to begin accepting and storing organic matter on the property in order to bring in some needed revenue. The Building Inspector approved the idea with the caveat that the storage of materials would have to stop if there were any complaints.

Profiles then began to accept organic matter, doing business under the ultimately unfortunate name of "Le Dump." Profiles distributed flyers which touted the location of the facility and invited customers to "dump anything that grows" at "Le Dump" for $1.50 a cubic yard. Predictably, area residents became concerned that Profiles was actually operating a dump on the premises and began complaining to the City. Profiles soon found itself at the center of a political maelstrom with significant numbers of the surrounding residents actively campaigning to kill the project. On May 6, 1980, the City Commission held a public meeting on the issue and heard the testimony of numerous area residents who were opposed to the project. The Commission voted to temporarily suspend the project at the meeting. By this point, Profiles's expenditures exceeded its available cash by $267,283.87. On July 30, 1980, the Commission held another public hearing to consider a resolution that would allow the project to go forward with other restrictions.[2] Again, the Commission heard the testimony of neighbors adamantly opposed to the project. The Commission did not act on the resolution and the May 6 suspension was never lifted. On March 10, 1981, the Commission voted to re-zone the property to a light industrial use category that would not allow a wood-chipping operation. Profiles soon lost the property in foreclosure proceedings.[3]

Profiles filed suit in the Southern District of Florida in August 1981 against the City, the mayor, and members of the Commission asserting claims under 42 U.S.C. § 1983. Profiles alleged, inter alia, that the City's actions in indefinitely suspending the project's permits and later re-zoning the property constituted a

---

[2]These restrictions were that a 150-foot buffer zone be created on the parcel, the concrete wall be built along the interior border of the buffer zone as opposed to at the property line, and that wood chipping machinery be in place at the site before operations could begin.

[3]The first mortgage on the property was already in foreclosure at the time the City re-zoned the property but the foreclosure proceedings were not final until after the re-zoning decision had been made. Therefore, we previously concluded that Profiles was still the landowner at the time of the final zoning decision. *See A.A. Profiles, Inc. v. City of Ft. Lauderdale,* 850 F.2d 1483, 1487 n. 5 (11th Cir.1988) (*Profiles I* ).

taking without just compensation and also violated unspecified rights under the Fourteenth Amendment. Following the presentation of Profiles's evidence on liability, the City moved to dismiss pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.[4] The district court granted the motion on December 30, 1986, finding that: (1) Profiles had not presented sufficient evidence to establish that a taking took place; (2) the City's actions in suspending Profiles's permits was a valid exercise of its police powers; (3) Profiles had sufficient state law remedies that it had failed to pursue; and (4) there was no causal connection between the City's actions and Profiles's damages. Profiles appealed.

On appeal, Profiles contended that it had presented sufficient evidence to demonstrate that the temporary suspension was a regulatory taking. *See A.A. Profiles v. City of Fort Lauderdale,* 850 F.2d 1483, 1486 (11th Cir.1988) (*Profiles I*). The City argued that it never reached a final decision on the project and therefore no taking took place. *See id.* at 1486-87. We concluded that the facts of the instant case were "indistinguishable" from those that supported a finding of a regulatory taking in *Wheeler v. City of Pleasant Grove,* 664 F.2d 99 (5th Cir. Unit B 1981) (*Wheeler I*).

In *Wheeler I,* the plaintiffs were granted a permit to build an apartment building on their property. *See* 664 F.2d at 100. Soon after the approval was granted, there was a massive wave of neighborhood resistance to the planned project, which eventually led Pleasant Grove's City Council to pass an ordinance forbidding the construction of new apartments. *See id.* The passage of the new ordinance voided the permit previously issued to the plaintiffs. *See id.* We held that the passage of the ordinance was confiscatory in nature and therefore a taking. *See id.* Because the facts of the instant case were analogous to those of *Wheeler I,* we concluded that the City's actions effected a taking and remanded for further proceedings in the case. *See Profiles I,* 850 F.2d at 1488.

Following the remand, Profiles settled with the individual defendants, leaving the City as the sole defendant. Proceedings in the district court resumed in February 1996. Since the City had not previously had the opportunity to offer evidence, the district court first held a new trial on liability. The district court found that the City had failed to present evidence which was substantially different from that already in the record on appeal. Therefore, the court concluded that the issue of liability was foreclosed by our opinion in *Profiles I* and proceeded to conduct a trial on damages. Profiles produced three appraisals of the value of the

---

[4]Rule 41(b) was amended in 1991 to remove language that authorized the use of the rule as a means of terminating an action when a plaintiff has not met its burden of proof. That provision of the former rule is now part of Rule 52(c).

project. The City produced an expert who presented his analysis of the financial data provided by Profiles.

In determining Profiles's damages, the district court took its cue from the portion of the *Profiles I* opinion in which we found that the instant case was indistinguishable from the *Wheeler* case. Using the formula established in our third *Wheeler* opinion, *Wheeler v. City of Pleasant Grove,* 833 F.2d 267 (11th Cir.1987) (*Wheeler III*), the court concluded that Profiles's losses were due to the project being "underfinanced and undercapitalized," and were not the result of the City's actions. The court therefore found that Profiles had failed to establish any compensable loss from the City's regulatory taking. Profiles has again appealed.

### Issues on Appeal

Profiles raises three issues on appeal. First, it contends that our mandate in *Profiles I* compelled the conclusion that both a taking occurred and that Profiles was damaged by the taking. Therefore, Profiles maintains the district court erred in finding Profiles suffered no losses due to the City's conduct. Second, Profiles argues that the district court attempted to indirectly avoid this court's mandate by finding that Profiles incurred no damages. Third, Profiles maintains that the district court erred by admitting the testimony of the City's expert witness.

### Standard of Review

We review the district court's determination of the proper legal standard to compute damages de novo. *See Sandoval v. Hagan,* 197 F.3d 484, 491 (11th Cir.1999). The court's factual findings, however, will only be reversed if clearly erroneous. *See Taylor Rental Corp. v. J.I. Case Co.,* 749 F.2d 1526, 1530 (11th Cir.1985). Rulings on the admissibility of expert testimony are subject to review for abuse of discretion. *See Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir.1999).

### Contentions of the Parties

Profiles contends that the district court was obligated to award compensation because this court concluded that a taking had occurred. Profiles argues that the just compensation clause of the Fifth Amendment is "self-executing" and the district court therefore had no discretion to find that Profiles had not been damaged due to the City's conduct. Further, Profiles contends that the district court erred by applying the formula for compensation of "temporary" takings instead of using the formula for permanent takings. Profiles also suggests that the court piled error upon error by misapplying the formula for temporary takings. Finally, Profiles contends that the district court erred in admitting the testimony of the City's expert witness.

The witness, an accountant, testified as to the financial condition of Profiles's wood chipping operation and opined that Profiles business would likely have failed even absent the City's actions. Profiles argues that the extent of the capitalization of its operation is irrelevant to the determination of just compensation and the expert's testimony should therefore have been excluded as not "helpful" under Rule 702 of the Federal Rules of Evidence.

The City contends that the district court properly applied the *Wheeler III* formula in computing the proper compensation in this case. Further, it argues that the application of the formula demonstrated that Profiles was owed no compensation for the City's actions and to award Profiles damages would unjustly enrich a business that was doomed to failure absent the City's actions. Finally, the City contends that the testimony offered by its expert met the requirements established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Discussion*

We agree with Profiles that the court erred in finding that Profiles suffered no compensable loss due to the City's actions. As we noted in *Profiles I,* the City's re-zoning decision was a "confiscatory measure" and a "taking." *Profiles I,* 850 F.2d at 1488, 1489. We remanded the case for further proceedings. *See id.* at 1489. The necessary implication of our holding was that Profiles suffered harm due to the City's actions. Generally, the law of the case doctrine requires a court to follow what has been explicitly or by necessary implication decided by a prior appellate decision. *See In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1549 n. 3 (11th Cir.1990). An appellate court's holding will be law of the case unless: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to that issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *United States v. Robinson,* 690 F.2d 869, 872 (11th Cir.1982).

After conducting a de novo trial, the district court determined that the City failed to "present evidence ... which was substantially different from that ... part of the record on appeal." (R.6-282 at 1.) The court also did not find that our holding had been abrogated by a contrary decision or was clearly erroneous. Accordingly, our holding that a taking had occurred was law of the case and the district court was obligated to determine the extent of the harm caused by the taking and compensate Profiles accordingly. What the district court was not free to do, however, was to revisit, in the guise of determining the proper damages, the

issue of whether a taking occurred.[5]  Therefore, the district court erred in concluding that Profiles's losses were due solely to the underfinancing of the project.

We now turn to the question of how to measure just compensation in this case.  Profiles argues that the district court erred by applying the *Wheeler III* damages formula, contending that the *Wheeler* formula is appropriate only in temporary takings cases.  Profiles maintains that the City's actions in this case caused a permanent taking.  We agree with Profiles that the *Wheeler III* formula would not provide just compensation in this case.[6]

The starting point for any inquiry into damages in a takings cases is to query "[w]hat has the owner lost?"  *Boston Chamber of Commerce v. Boston,* 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910).  The goal of the Fifth Amendment's just compensation requirement is to return the affected property owner to "as good position pecuniarily as he would have occupied if his property had not been taken."[7]  *United States v. Miller,* 317 U.S. 369, 373, 63 S.Ct. 276, 279-80, 87 L.Ed. 336 (1943).  Any inquiry into just compensation must be controlled by principles of equity and fairness to both the property owner and the

---

[5]We faced an analogous situation in the lengthy *Wheeler* litigation.  *See Wheeler v. City of Pleasant Grove,* 746 F.2d 1437 (11th Cir.1984) (*Wheeler II*).  In *Wheeler I,* we found that the application of the city ordinance was a "confiscatory measure" and remanded for the district court to determine damages.  *See Wheeler v. City of Pleasant Grove,* 664 F.2d 99, 100 (5th Cir. Unit B 1981) (*Wheeler I*).  On remand, the district court found that the offending ordinance did not "proximately cause any compensable injury."  *Wheeler II,* 746 F.2d at 1439.  The plaintiffs again appealed.  *See id.* at 1440.  We vacated the judgment, holding that the district court improperly conducted a de novo determination of whether the plaintiffs were damaged.  *See id.* at 1441.  We concluded that it was at least necessarily implied from our previous opinion that the city's unconstitutional conduct had damaged the plaintiffs.  *See id.* at 1441.  Therefore, we again remanded for the district court to determine the proper damages.  *See id.*

[6]We also agree with Profiles that the district court erred in interpreting our conclusion in *Profiles I* that the instant case was "indistinguishable" from *Wheeler I* as a signal that the proper formula for compensation was the one we established in *Wheeler III*.  *Profiles I,* 850 F.2d at 1488.  It is clear that our reference to *Wheeler I* in *Profiles I* was limited to the issue of whether a taking had occurred, and did not address the proper formula for compensation.  *See id.*  It is also notable that the *Profiles I* opinion makes no reference to 1987's *Wheeler III* opinion, which established the measure of compensation for temporary takings, instead referring only to *Wheeler I,* which dealt solely with the issue of liability.

[7]Two independent bases underlie the requirement that property owners be compensated for losses due to takings.  First, the Fifth Amendment requires that owners whose property is taken for "public use" must receive just compensation.  U.S. Const. amend. V.  If a local government's "police power regulation is not enacted in furtherance of the public health, safety, morals, or general welfare" there can be no "public use" of a landowner's property and, correspondingly, no Fifth Amendment taking.  *San Diego Gas & Elec. v. City of San Diego,* 450 U.S. 621, 656 n. 23, 101 S.Ct. 1287, 1306 n. 23, 67 L.Ed.2d 551 (1981) (BRENNAN, J., dissenting).  Compensation for losses due to invalid uses of the police power could still be available, however, under the Fourteenth Amendment's due process clause.  *See id.; Wheeler v. City of Pleasant Grove,* 833 F.2d 267, 270 n. 3 (11th Cir.1987) (*Wheeler III*).  The analysis used to calculate the proper compensation is the same whether a property owner has suffered a Fifth Amendment taking or a Fourteenth Amendment due process violation.  *See Wheeler III* at 270 n. 3.

government.  *See Bauman v. Ross,* 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270 (1897).

Although there are no absolute standards outside of the requirement that the compensation paid for a taking be "just," courts have established some working rules to guide the inquiry.  In cases where government regulation has permanently rendered property worthless, courts have generally adopted the "market value" test, which provides that the measure of just compensation is the market value of the property at the time of the taking.[8]  *See Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 474, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973).  Market value is generally determined from "what a willing buyer would pay in cash to a willing seller." *Id.* (internal quotation omitted).  And since a hypothetical buyer would look at both existing and potential uses for property, "fair market value takes into consideration '[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future ... to the full extent that the prospect of demand for such use affects the market value....' " *United States v. 320.0 Acres of Land,* 605 F.2d 762, 781 (5th Cir.1979) (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934)).

Courts have established another test to determine just compensation when a regulation diminishes but does not destroy the market value of property.  In the case of such a "partial taking," courts have applied a modified market value test which accounts for the diminution in value.  Generally, the proper method is to subtract the market value of the property as encumbered by the regulation from the market value of the property without the offending regulation in place. *See United States v. 101.88 Acres of Land,* 616 F.2d 762, 769 (5th Cir.1980).

The Supreme Court has also recognized that compensation may be due when a government regulation temporarily infringes upon an individual's property rights.  In *First English Evangelical Lutheran Church v. Los Angeles County* the Court held that the rescission of an ordinance which had completely denied the plaintiff the ability to use its property for multiple years was a "constitutionally insufficient" remedy.  482 U.S. 304, 322, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987).  In such a case, the government would also be obligated to compensate the property owner for its losses during the period that the offending regulation was

---

[8]Deviating from the market value test is appropriate when the property's market value is too difficult to determine or when applying the test would "result in manifest injustice to [the] owner or public...." *United States v. Commodities Trading Corp.,* 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950).

in place.[9] *See id.* In *Wheeler III* we concluded that a property owner's losses for a temporary taking are in the "form of an injury to the property's potential for producing income or an expected profit." *Wheeler III,* 833 F.2d at 271 (citation omitted). We therefore held that the proper measure of compensation was "the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction." *Id.*

Lost income was a proper measure of compensation in *Wheeler* because the affected property owners retained their parcel and were capable of proceeding with their development plans at the point we declared a taking had occurred and enjoined the enforcement of the offending ordinance. *See Wheeler v. City of Pleasant Grove,* 896 F.2d 1347, 1349-50 (11th Cir.1990) (*Wheeler IV*). All that the *Wheeler* plaintiffs had lost due to the taking was the income they would have otherwise gained during the time the ordinance was in effect.[10] *See Wheeler III,* 833 F.2d at 271. Turning to the facts of the instant case, it is apparent that applying the *Wheeler III* test would not lead to just compensation. The *Wheeler III* framework is appropriate only when the property owner's losses are limited to the temporary use of its property and the concomitant income. Here, Profiles neither possessed nor retained the ability to derive economic value from the property at the point we declared that a taking had occurred. Because the injury in this case was permanent rather than temporary, the proper measure of compensation is not the *Wheeler III* standard but instead the diminution in market value test.[11]

Although the district court noted that there were three appraisals of the property submitted by Profiles, these appraisals have not been made part of the record on appeal. The record also does not include the substance of the expert testimony proffered by Profiles as evidence of the property's value. Accordingly, we are unable to determine on this record the extent of the diminution, if any, in the property's market value that was due to the City's actions. We therefore remand to the district court for additional fact-finding on the issue. In determining the reduction in the market value of the parcel, the court must consider any aspect of

---

[9]As the *First English* Court noted, it has been long established that governments are constitutionally obligated to compensate property owners for the temporary physical appropriation of property. *See First English Evangelical Lutheran Church v. Los Angeles County,* 482 U.S. 304, 318, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987).

[10]In fact, the market value of the Wheeler's parcel had appreciated during the period the taking was in effect. *See Wheeler v. City of Pleasant Grove,* 896 F.2d 1347, 1351 (11th Cir.1990) (*Wheeler IV*).

[11]Profiles has never alleged, nor does the record support a conclusion, that the City's actions completely destroyed the property's market value.

the property that could have affected the amount a reasonable buyer would be willing to pay. *See Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. at 474, 93 S.Ct. at 794. The district court must limit its inquiry, however, to the value of the property as of the day of the taking. That is, Profiles's precarious financial state and the later foreclosure are relevant only to the extent that they could have affected the property's market value.[12]

Finally, we agree with Profiles that the district court abused its discretion in admitting the testimony of the City's expert witness. The substance of the witness's testimony was his opinion that Profiles did not have a positive equity position in the project by May 1980. (R.13 at 66.) The district court later relied on this testimony to find that Profiles's operation would have failed absent the City's actions and therefore Profiles was owed no compensation. As we note above, the relevant inquiry is not whether Profiles would have been successful in proceeding with its business, but to what extent the City's actions diminished the property's market value. Because the expert's testimony was addressed solely to the issue of whether Profiles's operation would have succeeded, it was irrelevant to the determination of just compensation and therefore should have been excluded.[13]

*Conclusion*

For the foregoing reasons, we reverse the judgment of the district court and remand for the court to determine the compensation owed Profiles using the diminution in market value test. On remand, the court should limit its inquiry to any factors which would have affected the property's market value as of the date of the taking.

REVERSED AND REMANDED WITH INSTRUCTIONS.

---

[12]The district court may have been correct in concluding that the project was doomed even absent the City's actions. However, the correct focus in determining compensation here is the effect of the regulation upon the market value of the property, not on whether Profiles's operation would have ever become a going concern or turned a profit.

[13]We do not address, however, whether testimony that a property owner could not have successfully made a profit even absent a confiscatory government action would be relevant in a true temporary takings case, such as *Wheeler,* where the property owner's loss is measured by the property's potential for producing income during the time the taking is effective.