

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-12-00034-CV |
| Appellant, | § | |
| | § | Appeal from the |
| V. | § | County Court at Law No. 1 |
| MOORE OUTDOOR PROPERTIES, | § | |
| L.P. AND ARRINGTON OUTDOOR | | of Tarrant County, Texas |
| OF FORT WORTH, L.P., | § | |
| | | (TC#07-53500-1) |
| | § | |
| Appellees. | | |
| | § | |

## **O P I N I O N**

The State of Texas is appealing a judgment awarding Arrington Outdoor of Fort Worth,

L.P. the sum of $969,243 for the taking of Arrington's property interests. We affirm.

**FACTUAL SUMMARY**

In June of 2007, the State filed a petition for condemnation of a parcel of land located

along Interstate 30 in Fort Worth for a highway construction project.[1]   Moore Outdoor

---

[1]  This appeal was transferred from the Second Court of Appeals to the Eighth Court of Appeals pursuant to a docket equalization order. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2013). We must decide the case in accordance with the precedent of the Second Court of Appeals under principles of stare decisis if our decision otherwise would be inconsistent with the precedent of that court. *See* TEX.R.APP.P. 41.3.

Properties, L.P., owned the land. A large billboard structure[2] had been on the property since 1973 when it was built by Moore and it was re-built in the mid 1990's. The billboard had two 15 foot x 60 foot displays facing east and westbound traffic on Interstate 30. In 1998, Fort Worth adopted an ordinance prohibiting the construction of new off-premises advertising signs and requiring that existing signs be upgraded. The billboard structure is a legal non-conforming sign because a legal permit had been issued prior to the ordinance's adoption. In January 2006, Arrington purchased the billboard structure, permit, and leasehold rights from Moore at a price of $1,268,454.[3] Moore retained ownership of the land underneath the billboard structure and Arrington leased the land for 99 years with an option to extend the lease for four 50 year periods. The lease rate is $26,400 per year or 25 percent of net revenue, whichever is greater.

Following a hearing, the Special Commissioners awarded $334,194 jointly to Moore and Arrington for the total condemnation.[4] Both Moore and Arrington objected to the award. On November 26, 2007, the State deposited the award in the court's registry. Arrington counterclaimed for inverse condemnation for the State's taking of its leasehold property interests and sought to recover compensation.

Arrington moved for partial summary judgment on the issue of compensability of its property. Arrington argued that the condemnation resulted in the taking of its interests in the ground lease, the sign permit, and the billboard structure, and it was entitled to compensation

---

[2] Arrington's valuation expert, Paul Wright, referred to the billboard structure as the "subject sign" in his report. In their briefs, the parties refer to it as the structure or the billboard structure. For clarity and convenience, the opinion will use the term "billboard structure."

[3] Arrington purchased a total of sixteen billboards, including the billboard at issue here, from Moore for the total price of $5,250,000. According to Wright, the billboard structure was allocated a price of $1,268,454.

[4] Other entities were included in the joint award but only Moore and Arrington objected.

under the U.S. Constitution, the Texas Constitution, federal and state highway beautification statutes, and the federal Uniform Relocation Act. The State responded that it is not required to compensate Arrington for the billboard structure because it is personal property, not real property, and that a sign permit does not create a property right, and therefore, it is not required to compensate Arrington for this interest. The trial court granted Arrington's partial summary judgment motion.

Prior to the commencement of trial, the parties stipulated that the State has the right to recover and condemn the property in question, that all prior steps and due processes of law were duly, legally, and timely performed, that all legal prerequisites for trial of the case had been complied with, and the only remaining issue is the amount of compensation due Moore and Arrington. The State and Moore subsequently entered into a compromise agreement that Moore is entitled to the sum of $480,000 for the condemnation of its property interests. The State and Arrington proceeded to trial before a jury on the issue of the market value of Arrington's property interests.

Arrington's expert witness on valuation, Paul Wright, appraised the fair market value of Arrington's property interests on the date of the taking at $1,206,500 under the comparable sales approach and at $1,030,000 under the income approach. The jury found that the fair market value of Arrington's property interests on the date of the taking, November 26, 2007, was $969,243. The judgment awarded Moore the sum of $480,000 in accordance with the settlement agreement and awarded Arrington the sum of $969,243 based on the jury's verdict.

## COMPENSABILITY OF THE SIGN PERMIT

## AND BILLBOARD STRUCTURE

By two related issues, the State challenges the trial court's summary judgment ruling regarding compensability of Arrington's interest in the sign permit and the billboard structure.

*Traditional Summary Judgment Standard*

We review the grant or denial of a traditional motion for summary judgment *de novo*. *Valence Operating Company v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 365 (Tex.App.--Dallas 2009, pet. denied). The standard of review for traditional summary judgment under TEX.R.CIV.P. 166a(c) is well established. *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). The moving party carries the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). Evidence favorable to the non-movant will be taken as true in deciding whether there is a disputed issue of material fact. *Fort Worth Osteopathic Hospital, Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Tranter v. Duemling*, 129 S.W.3d 257, 260 (Tex.App.--El Paso 2004, no pet.). All reasonable inferences, including any doubts, must be resolved in favor of the non-movant. *Fort Worth Osteopathic Hospital*, 148 S.W.3d at 99.

*Relevant Law*

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S.CONST. AMEND. V. The Texas Constitution also requires governmental entities to compensate landowners adequately when property is taken for public use. TEX.CONST. art. I, § 17 ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made,

unless by the consent of such person . . . .");[5] *County of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004). A taking under Article I, Section 17 may be physical or regulatory. *Tarrant Regional Water District v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998). A physical taking occurs when the government physically appropriates or invades private property. *Yee v. City of Escondido*, 503 U.S. 519, 522, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992); *Gragg*, 151 S.W.3d at 554. The term "property," as it applies to takings law, does not only mean the real estate, but every right which accompanies its ownership. *See DuPuy v. City of Waco*, 396 S.W.2d 103, 108 (Tex. 1965). In this same context, the term "owner" includes a lessee. *Elliott v. Joseph*, 351 S.W.2d 879, 884 (Tex. 1961). Compensability is a question of law for the court, subject to *de novo* review. *Santikos*, 144 S.W.3d at 459; *Interstate Northborough Partnership v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

*The "Leasehold Property Interests"*

Arrington argued in its summary judgment motion, as it does on appeal, that its interests in the sign permit, billboard structure, and leasehold form an intertwined property interest or aggregate asset which would be sold together in the market. It reasons that the combined "leasehold property interests" are compensable in a condemnation proceeding. We will examine the sign permit and billboard structure to determine whether each is compensable.

*The Billboard Structure*

---

[5] Our case is governed by the pre-2009 version of Article I, Section 17 because the taking occurred in November 2007.

In Issue Two, the State contends that the billboard structure is not part of the real property because Arrington has consistently treated the billboard as personal property, billboards are readily relocated, and the billboard is not adapted to any purpose related to the land. The general rule is that improvements situated on the portion of land taken are to be considered part of the realty. *State v. Clear Channel Outdoor, Inc.*, 274 S.W.3d 162, 165 (Tex.App.--Houston [1st Dist.] 2008, no pet.), *citing State v. Carpenter*, 89 S.W.2d 979, 980 (Tex. 1936). If a fixture is attached to the real estate, it must be treated as real estate in determining the total award. *Almota Farmers Elevator & Warehouse Company v. United States*, 409 U.S. 470, 478 n.5, 93 S.Ct. 791, 797 n.5, 35 L.Ed.2d 1 (1973). Generally, whether an attachment of personalty to realty constitutes an improvement is a question of the owner's intent. *Sonnier v. Chisholm-Ryder Company, Inc.*, 909 S.W.2d 475, 479 (Tex. 1995).

Citing *Logan v. Mullis*, 686 S.W.2d 605 (Tex. 1985), the State argues that the billboard structure is not a fixture but rather is removable personal property. *Logan* requires consideration of three factors when determining whether chattel is removable personal property or a fixture: (1) the mode and sufficiency of annexation, either real or constructive; (2) the adaptation of the article to the use or purpose of the realty; and (3) the intention of the party that annexed the chattel to the realty. *Logan*, 686 S.W.2d at 607. The third factor is preeminent, and the first two factors constitute evidence of intent. *Id.*

Arrington responds that the *Logan* test is inapplicable to a condemnation proceeding and it cites *State v. Clear Channel Outdoor, Inc.*, 274 S.W.3d 162, 165 (Tex.App.--Houston [1st Dist.] 2008, no pet.) in support. In *Clear Channel*, the First Court of Appeals noted that the *Logan* test is routinely used to determine ownership of a fixture or liability for an injury and held

6

it is inapplicable in condemnation cases. *Clear Channel Outdoor*, 274 S.W.3d at 165; *see State v. Clear Channel Outdoor, Inc.*, No. 01-11-00197-CV, 2012 WL 4465338, at *4 (Tex.App.--Houston [1st Dist.] Sept. 27, 2012, pet. filed)(memo. op.)(in subsequent appeal, refusing to reconsider its prior ruling regarding inapplicability of *Logan*). The Court concluded that the *Logan* test's focus on a property owner's intent as the preeminent factor conflicts with the well-settled principle in condemnation cases that the owner's characterization of its property rights for other purposes is not determinative of whether it constitutes a compensable property interest. *See Clear Channel*, 274 S.W.3d at 165, *citing Almota*, 409 U.S. at 478 n.5, 93 S.Ct. at 797 n.5 (Supreme Court held that a condemning authority cannot take advantage of an agreement between the lessor and lessee designating an improvement as personal property).

However, we note that the Second Court of Appeals applied the *Logan* test in an inverse condemnation case when determining whether the sign structure was compensable property. *City of Argyle v. Pierce*, 258 S.W.3d 674, 683 (Tex.App.--Fort Worth 2008, pet. dism'd). In that case, the plaintiffs alleged a regulatory taking of the property owner's fee and of the outdoor advertising company's leasehold, sign, and TxDOT sign permit. As this case is before us pursuant to a docket equalization order, we are required by the Rules of Appellate Procedure to follow the precedent of the Second Court of Appeals when determining whether to apply the *Logan* test and will do so. *See* TEX.R.APP.P. 41.3.

The first *Logan* factor requires us to consider the mode and sufficiency of annexation, either real or constructive. *Logan*, 686 S.W.2d at 607. The undisputed evidence shows that the billboard structure has been on the property since 1973 although it was re-built in the 1990's. The structure is quite large with sign faces that are 15 feet by 60 feet. The sign faces are

7

significantly larger than the standard 14 feet by 48 feet sign faces. The head of the structure is mounted on a pole which is three and a half feet in diameter and this pole is buried 22 feet in the ground in order to comply with the City of Fort Worth's construction requirements. Large equipment was required to dig the hole to sufficient depth and cranes had to be used to lift the steel components of the structure. Removal of the billboard structure would likewise require heavy equipment, including a crane, and it is not capable of being readily relocated.

Next, we must consider the adaptation of the article to the use or purpose of the realty. *Logan*, 686 S.W.2d at 607. The State flatly dismisses the notion that the billboard structure is adapted to the use or purpose of the realty, but the evidence showed that the small, triangular-shaped parcel of land had been used exclusively for outdoor advertising for almost 35 years at the time of the taking. The billboard structure is obviously well-suited for that purpose.

Finally, we consider whether Arrington, and its predecessor in interest, Moore, intended the billboard structure to be removable personal property or a fixture. *Logan*, 686 S.W.2d at 607. We are to give this part of the test pre-eminence in determining Arrington's intent to make the billboard a fixture. In addition to the evidence showing the extent to which the billboard is physically attached to the land, there is evidence that Arrington intended for the billboard structure to remain on the property for the entire 99 year term of the lease and that Arrington had an option to extend the lease for four 50 year periods. That fact is persuasive that the billboard was intended to be a fixture.

The State asserts that Arrington and the taxing authorities have treated the billboard structure as personal property for purposes of taxation. We understand the State to argue that this is indicative of Arrington's intent. The State has included a link in its brief to the Tarrant

County Appraisal District's website for Arrington's business personal property. This "evidence" is not part of the summary judgment evidence. Accordingly, it is not properly before us. *See Young v. Gumfory*, 322 S.W.3d 731, 738 n.3 (Tex.App.--Dallas 2010, no pet.)(noting that the court of appeals' review is limited to the evidence before the trial court at the time of the motion for partial summary judgment). There is no evidence in the record that Arrington's actions rendered the billboard structure as personal property.

The State also relies on language in the lease to prove Arrington intended for the billboard to be personal property rather than a fixture. The lease provides that upon termination of the lease for any reason, Arrington must remove the sign within 90 days. Likewise, the parties agreed that if Moore interfered with the billboard's visibility, Arrington could terminate the lease and remove the billboard structure. While we are required to follow the Second Court of Appeals' decision in *City of Argyle v. Pierce* and apply the *Logan* test in this condemnation case, we are not required to apply the test in such a manner that would be contrary to decisions of the United States Supreme Court or the Texas Supreme Court. The United States Supreme Court held in *Almota* that such provisions exist for the protection of the tenant and cannot be invoked by the condemnor. *Almota*, 409 U.S. at 478 n.5, 93 S.Ct. at 797 n.5. Accordingly, we will not consider those lease provisions as evidence of Arrington's intent with respect to the billboard structure.

Another lease provision distinguishes between the taxes on the land and those on the billboard structure and imposes on Arrington the responsibility for paying the taxes on the structure. Rather than indicating that Arrington intended for the billboard structure to be personal property, the provision in question simply divides the responsibility for payment of the

9

taxes according to ownership. The lease also includes a paragraph titled "Taking" which provides that if the property or the sign is taken, Arrington can elect to terminate the lease upon 30 days' notice to Moore. Moore and Arrington also agreed that Arrington would be entitled to receive any awards related to the taking of or damage to the leasehold interest and the billboard structure. These provisions contemplate that the billboard structure is a fixture.

Having considered the undisputed facts of this case in light of the *Logan* factors, we conclude that the billboard structure is a fixture, and therefore, the State is required to pay Arrington just compensation for the taking. *See Logan*, 686 S.W.2d at 608 (holding that the culvert was permanently attached to the realty as a matter of law where evidence showed that the culvert was embedded under gravel road in various materials, including gravel and dirt, and it was difficult to remove once embedded); *Harris County Flood Control District v. Roberts*, 252 S.W.3d 667, 672-73 (Tex.App.--Houston [14th Dist.] 2008, no pet.)(evidence supported trial court's determination that a billboard structure was a fixture); *see also Clear Channel*, 274 S.W.3d at 165-66 (holding that Clear Channel created a fact issue sufficient to defeat plea to the jurisdiction related to inquiry whether the billboard structure is a fixture where the evidence showed that the central pole of the billboard structure was embedded in concrete and affixed to the land). Issue Two is overruled.

### The Sign Permit

In Issue One, the State contends that the sign permit is a privilege and it does not constitute property or a property right, and therefore, the sign permit is not compensable property in a condemnation proceeding. The State cites *City of Argyle v. Pierce* in support of its argument. In that case, a property owner and outdoor sign company brought declaratory

10

judgment and inverse condemnation actions against the City of Fort Worth when the city sought to enforce its sign ordinance which prohibited off-premises outdoor advertising signs in its extra-territorial jurisdiction. *City of Argyle*, 258 S.W.3d at 679. Clear Channel leased property from a private land owner, Pierce, for the purpose of putting a billboard on the land, and it obtained a sign permit from the Texas Department of Transportation (TxDOT). The City of Argyle filed a plea to the jurisdiction on the ground that the plaintiffs had not alleged a constitutional taking. The trial court denied the plea to the jurisdiction. The Second Court of Appeals held that the TxDOT permit is not a property interest compensable as a result of inverse condemnation because the Texas Administrative Code expressly states that issuance of a permit by TxDOT shall not be deemed to create a property right in the permittee. *City of Argyle*, 258 S.W.3d at 683, *citing* 43 TEX.ADMIN. CODE § 21.581 (2002). This constituted the sole basis for the court of appeals' conclusion and it did not engage in any additional analysis regarding the compensability of the sign permit. The instant case is distinguishable because the permit at issue here was issued by the City of Fort Worth, not TxDOT. The Fort Worth Code of Ordinances does not contain the type of provision contained in the Administrative Code that the issuance of a permit does not create a property right. Consequently, we reject that aspect of the *City of Argyle* decision in our review of this issue.

As a general rule, a license or permit is a privilege, not a property right. *See, e.g., House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 657 (Tex. 1965)(stating that a license to sell cigarettes is a privilege, not constitutional property); *Jones v. Marsh*, 224 S.W.2d 198, 201 (Tex. 1949)(stating that a "license or permit to sell beer or other intoxicating liquor is a privilege and not a property right"). We have found no authority for the proposition that a sign or billboard

11

permit is a compensable property right in the context of a condemnation proceeding. We conclude that the trial court erred by granting summary judgment in favor of Arrington on this specific ground.

Under Rule 44.1(a)(1), the trial court's error of law does not require reversal unless the court of appeals concludes that the error probably caused the rendition of an improper judgment. TEX.R.APP.P. 44.1(a)(1). In the willing seller-willing buyer test of market value, it is frequently said that all factors should be considered which would reasonably be given weight in negotiations between a seller and a buyer. *City of Austin v. Cannizzo*, 153 Tex. 324, 332-33, 267 S.W.2d 808, 814 (1954). This would exclude consideration of purely speculative uses to which the property might be adaptable but wholly unavailable, but would permit consideration of all uses to which the property was reasonably adaptable and for which it was, or in reasonable probability would become, available within a reasonable time. *Id.* In this case, the existence of the permit would be taken into consideration in determining the fair market value of the leasehold and the billboard structure regardless of whether the State can be said to have "taken" the permit. Consequently, it cannot be said that the error caused the rendition of an improper judgment. Issue One is overruled.

**ADMISSIBILITY OF EXPERT TESTIMONY**

In Issue Three, the State argues that the trial court abused its discretion by admitting the expert appraisal testimony of Paul Wright on fair market value of the property. The State does not challenge Wright's qualifications, but instead argues that his expert testimony was not relevant and reliable because he based his opinion on non-compensable business income.

In a condemnation proceeding, the burden to establish the value of the condemned property is on the condemnee. *Religious of Sacred Heart of Texas v. City of Houston*, 836 S.W.2d 606, 613 (Tex. 1992). The expert testimony of appraisal witnesses in condemnation actions must be relevant and reliable under TEX.R.EVID. 702. *Guadalupe-Blanco River Authority v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002); *see Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). Appraisal expertise is a form of specialized knowledge used to assist the trier of fact to determine a fact in issue. *Guadalupe-Blanco River Authority*, 77 S.W.3d at 807. We review the trial court's decision to admit the expert appraisal testimony under the abuse of discretion standard. *Id.* A trial court does not abuse its discretion by admitting expert testimony if the testimony is relevant to the issues in the case and is based on a reliable foundation. *State v. Central Expressway Sign Associates*, 302 S.W.3d 866, 870 (Tex. 2009).

Texas recognizes three approaches to determining the market value of condemned property: the comparable sales method, the cost method, and the income method. *Central Expressway*, 302 S.W.3d at 871; *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). The comparable sales method is the favored approach, but when comparable sales figures are not available, courts will accept testimony based on the other two methods. *Central Expressway*, 302 S.W.3d at 871. The cost approach looks to the cost of replacing the condemned property minus depreciation. *Id.* The income approach is appropriate when the property would be priced according to the rental income it generates. *Id.* All three methods are designed to approximate the amount a willing buyer would pay a willing seller for the property. *Id.*

13

Texas law allows income from a business operated on the property to be considered in a condemnation proceeding in two situations: (1) when the taking, damaging, or destruction of property causes a material and substantial interference with access to one's property, and (2) when only a part of the land has been taken, so that lost profits may demonstrate the effect on the market value of the remaining land and improvements. *Central Expressway*, 302 S.W.3d at 871. With the exception of these two situations, income from a business operated on the property is not recoverable and should not be included in a condemnation award because profits from a business are speculative and the business has not been taken and can presumably continue to operate at another location. *Id.*

Wright considered the same three appraisal approaches discussed by the Supreme Court in *Central Expressway*: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. He did not use the cost approach because billboard participants do not use this approach when making buying or selling decisions. Further, Wright explained that this approach has been rendered virtually meaningless due to government limitations on new billboard development.

Wright utilized the sales comparison approach to appraise the fair market value of the property. This approach typically uses physical units of comparison or economic units of comparison. Wright used the effective gross income multiplier and a cash flow multiplier as economic units of comparison to appraise the fair market value of Arrington's property interests in the leasehold and billboard. According to Wright, billboard market participants use the effective gross income multiplier (EGIM) method when making buying or selling decisions. Wright determined that the effective gross income for the two billboards was $144,060 and he

applied a multiple of 8.5 to that figure for an EGIM value of $1,224,510 (a rounded value of $1,225,000).

Wright also utilized a cash flow multiplier as an economic unit of comparison. He determined that the cash flow for the billboard structure was 50 percent of the effective gross income, or $72,030. Wright's data indicated that billboard acquisitions between 2001 and 2007 involved an average multiple of 12.8 and he also considered six comparable sales with an average cash flow multiple of 14.51. He applied a cash flow multiplier of 16.50 to the cash flow for the subject billboard structure for a cash flow multiplier value of $1,188,495 (a rounded value of $1,188,000). Wright applied a weight of 50 percent to the rounded EGIM and cash flow multiplier values for a total fair market value of $1,206,500.

Wright also employed the income approach in his appraisal of the property. He determined that the discounted cash flow value estimate was $750,000 and capitalized the estimated operating income or cash flow at 7 percent and developed a capitalized income value estimate of $1,030,000.

The record before us reflects that Wright utilized the sales comparison approach and market-appropriate multipliers to determine what a willing buyer would pay a willing seller for the leasehold and billboard structure which has a valid sign permit. Wright used the net income and cash flow figures to determine the market value and he indicated that this is the primary measure of market value used by market participants. Wright also used the income approach which is based on capitalized cash flow. The State argues that Wright's testimony impermissibly utilized business income to determine the market value in violation of *Central Expressway*.

15

In *Central Expressway*, the State condemned a parcel of land needed to improve a highway interchange. *Central Expressway*, 302 S.W.3d at 869. CESA held an easement for the construction and operation of a billboard on a smaller parcel located mostly on the parcel being condemned. *Id.* CESA leased the easement to Viacom Outdoor for $11,000 per year or 25 percent of billboard advertising revenues, whichever was greater. *Id.* Viacom sold advertising space on a billboard on the property. *Id.* At the time of the taking, the billboard generated $168,000 per year in advertising revenue. *Id.* The special commissioners determined the fair market value of the property to all of the interest holders was $2,012,300 and the State objected. *Id.* The State settled with the fee owner, another leaseholder, and Viacom, but it proceeded to trial against CESA.[6] *Id.* Thus, the only property interest at issue was CESA's easement.

Prior to trial, the State challenged the admissibility of CESA's appraisal expert on two grounds: (1) he had mischaracterized the billboard structure as real property rather personal property; and (2) he had improperly included in his appraisal the business income generated by Viacom's billboard. *Central Expressway*, 302 S.W.3d at 869-70. The trial court struck CESA's expert on the first ground and the Supreme Court noted that neither Viacom nor CESA had challenged that ruling on appeal. *Id.* at 870. The trial court also sustained CESA's challenge to the State's expert, Grant Wall, who used the income approach to valuing the property. *Id.* Wall estimated future rental income generated by the easement and applied a capitalization rate to arrive at a present value. *Id.* Wall capitalized the income paid by Viacom to CESA in rent for the easement and estimated the fair market value to be $359,817. *Id.* The trial court concluded

---

[6] The State agreed to pay relocation benefits to Viacom and it relocated its billboard to a new location. *Central Expressway*, 302 S.W.3d at 869.

16

that Wall's testimony was unreliable because he did not include billboard advertising revenues in his appraisal of the easement's value. *Id.* CESA's principals testified that the property was worth $2,500,000. *Id.* The jury determined that the fair market value of the property was $1,850,000. *Id.*

The Supreme Court noted that Texas law allows income from a business operated on the property to be considered in a condemnation proceeding in only two situations: (1) when the taking, damaging, or destruction of property causes a material and substantial interference with access to property; and (2) when only a part of the land has been taken, so that lost profits may demonstrate the effect on the market value of the remaining land and improvements. *Id.* at 871. In every other situation, income from a business operated on the property is not recoverable and should not be included in a condemnation award. *Id.* This rule is applied for two reasons. First, profits from a business are speculative and depend upon general market conditions and the business skill of the person conducting it. *Id.* Second, only the real estate has been taken and the owner can presumably continue to operate the business at another location. *Id.* CESA argued that billboard advertising revenue is derived from the intrinsic value of the land, and therefore, the revenue should be treated like rental income for purposes of an income-method appraisal. *Id.* at 871. The Supreme Court acknowledged that some states have decided that billboard advertising revenues may properly be considered in estimating the value of real property. *Id.* at 872. The Court rejected CESA's argument and refused to adopt this rule. *Id.* The Court held that Wall's appraisal was based upon an accepted and reliable method of appraising the condemned easement and the trial court abused its discretion by excluding the testimony. *Id.* at 874.

The Supreme Court made it clear in *Central Expressway* that an appraisal of an easement in a condemnation proceeding cannot be based on business income generated by a business operated on the easement by another party except in the two situations described in the opinion, but it acknowledged that "[g]eneral estimates of what the property would sell for considering its possible use as a billboard site are acceptable." *Central Expressway*, 302 S.W.3d at 874. *Central Expressway* did not expressly address how the fair market value of a leasehold interest and billboard structure used exclusively for offsite advertising would be determined. The valuation of these property interests will necessarily be different than the valuation of the easement. Wright testified that billboard market participants use both the comparable sales and income approaches when making purchase and sale decisions, but the comparable sales approach is the primary measure of market value used by billboard market participants. Thus, Wright's testimony reflects what a willing buyer would pay a willing seller for the compensable property interests at issue here.

The rule that business income cannot be considered in determining the market value of the real property is based, in part, on a presumption that the property owner can relocate its business to another location. It is undisputed that Arrington cannot move the billboard structure to another location in Fort Worth because the construction of new signs is prohibited and the sign permit is site specific. Thus, the taking of the property and billboard structure has destroyed the business related to this billboard. We have not found any cases refusing to follow the general rule that business income is not compensable when there is a total taking even though the business is destroyed because it cannot be relocated. In fact, the Austin Court of Appeals applied the general rule in an inverse condemnation case where the plaintiff alleged its business was lost

because it could not be relocated. *AVM-HOU Ltd. v. Capital Metropolitan Transportation Authority*, 262 S.W.3d 574, 578-79 (Tex.App.--Austin 2008, no pet.). Capital Metro condemned real property in Austin to use for a bus maintenance facility. *Id.* at 576. AVM operated an adult video store business on the property as a lessee. *Id.* Judgment was entered in the eminent domain proceeding and the amount of compensation awarded for the taking of the real property was apportioned between the property owner and AVM. *Id.* AVM subsequently filed an inverse condemnation claim seeking to recover additional compensation for the taking of its adult video store business. *Id.* AVM argued that it was entitled to compensation for the taking of its business because it could not be relocated due to zoning restrictions for operating an adult-oriented business. *Id.* The trial court granted summary judgment in favor of Capital Metro on the ground that Texas does not recognize a cause of action for a tenant to recover lost profits of a business located upon realty acquired in its entirety for public use by eminent domain. *Id.* at 577. On appeal, the Third Court of Appeals acknowledged that lost profits can be recovered where a partial taking of property has impaired access to the remainder of the property or has damaged the market value of the remainder, but no Texas court has allowed the recovery of the loss of a business resulting from the taking of the entire property. *Id.* at 578-79. The Court of Appeals rejected AVM's argument that the impossibility of relocation transformed the loss of its business into a "second taking" because Texas courts have consistently held that damages to business interests are not compensated when they occur as a result of the taking of the entire property on which the business is located *Id.* at 579-83 (reviewing numerous cases following this rule). The Court held that when real property is acquired by eminent domain, in fee simple

19

and in its entirety, there is no cause of action in Texas for inverse condemnation to recover for the loss of a business located upon the realty taken. *Id.* at 586.

Even though *Central Expressway* concerned the valuation of an easement, the Supreme Court made it clear that revenues from billboard advertising cannot be used as the basis for determining the fair market value of property taken in a condemnation proceeding. Arrington's expert testified that buyers and sellers in the billboard marketplace use valuation approaches based on advertising revenue. In this instance, then, *Central Expressway's* rule runs counter to the notion that fair market value is what a willing buyer will pay a willing seller for the property. As an intermediate appellate court, we are duty-bound to follow the decisions of the Texas Supreme Court and we can find no basis for refusing to apply *Central Expressway* to this case. Wright's testimony went beyond providing a general estimate of what the property would sell for considering its possible use as a billboard site and his appraisal was based specifically on the advertising revenues generated by the billboard. Accordingly, we are compelled by the Supreme Court's decision in *Central Expressway* to find that the trial court abused its discretion by concluding that Wright's testimony was relevant and based on a reliable foundation.

We now consider whether the error probably caused the rendition of an improper judgment. *See* TEX.R.APP.P. 44.1(a)(1). Mike Wolverton, the managing partner of Arrington, testified without objection that Arrington paid $1,268,454.18 for the property in January 2006. Wolverton discussed the strength of the economy and the market conditions in Fort Worth at the time of the purchase and continuing to the date of the taking in November 2007. He estimated that the real estate market in general had improved at a rate of 3 percent per year in 2006 and 2007. Further, the market for this particular property had continued to improve from the date of

purchase until the date of the taking. In Wolverton's opinion, the property had a market value of $1.345 million on the date of the taking. In Texas law, an owner of property is qualified to testify to the property's market value. *Central Expressway*, 302 S.W.3d at 874. Furthermore, the Supreme Court stated in *Central Expressway* that general estimates of what the property would sell for considering its possible use as a billboard site is admissible. *Id.* Accordingly, we find the error harmless under Rule 44.1(a)(1)'s standard. Issue Three is overruled. Having overruled each issue, we affirm the judgment of the trial court.


GUADALUPE RIVERA, Justice

November 13, 2013

Before Rivera, J., Rodriguez, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), sitting by assignment